**Ex parte AUDITOR OF PUBLIC ACCOUNTS.**

Supreme Court of Kentucky.

Nov. 25, 1980.

Leslie G. Whitmer, William J. Parker, Henry R. Wilhoit, Jr., Charles Landrum, Jr., Frankfort, for Kentucky Bar Assn.

Rhonda E. Morgan, Frankfort, for Auditor of Public Accounts (Dr. Graham).

Fred G. Francis, Chairman, Kentucky State Bd. of Bar Examiners, Prestonsburg, for Bd. of Bar Examiners.

## OPINION AND ORDER

A controversy exists between the Auditor of Public Accounts (hereinafter the Auditor) and the Kentucky Bar Association (hereinafter the Association). The question is whether the Auditor is legally entitled or required to audit the books and accounts of the Association. It comes before this court on a direct application by Hon. James B. Graham, the present Auditor, addressed to the Chief Justice, requesting that the controversy be resolved by the Supreme Court. This court does not render advisory opinions. It is generally authorized to exercise "appellate jurisdiction only, except it shall have the power to issue all writs necessary in aid of its appellate jurisdiction, or the complete determination of any cause, or as may be required to exercise control of the Court of Justice." Const.Sec. 110(2)(a). This is an actual controversy requiring an official decision, and because the Association is an arm of the court itself, and therefore cannot properly be sued in any of the other courts of the state, this court is only forum in which the controversy can be heard and officially resolved. See *Ex parte Farley*, Ky., 570 S.W.2d 617, 621 (1978).

Until 1934 the state bar association was a voluntary organization. Before 1918 law-

yers were admitted, or "licensed," to practice upon local examination. Cf. Ch. 100, Acts of 1892; Ch. 17, Acts of 1902. The first Board of Bar Examiners was established by Ch. 131, Acts of 1918. There were no "license" fees except for original admission. By Ch. 3, Acts of 1934, the General Assembly integrated the bar by requiring all persons practicing law to be members of a state bar association. This Act directed the then Court of Appeals to adopt rules defining the practice of law, prescribing a code of professional ethics, establishing practice and procedure for the discipline, suspension and removal of attorneys, and organizing and governing a bar association "to act as *an administrative agency of the Court of Appeals* of Kentucky for the purpose of enforcing such rules and regulations as are prescribed, adopted and promulgated by the Court of Appeals under this Act, providing for the government of the State Bar *as a part of the judicial department of the State government*," etc. (Emphasis added.) The 1934 Act also authorized the court to fix a schedule of fees (not exceeding $2.00 per annum) for its administration.

Upon the recodification of the Kentucky Statutes in 1942 the provisions relating to the Board of Bar Examiners, admission to the practice of law, the organization and government of a bar association by the then Court of Appeals, and the regulation of law practice and practitioners, were placed in KRS Chapter 30. As of this time, application fees for admission to the bar ($10.00) were required to be paid to and held by the Clerk of the Court of Appeals subject to disbursement upon order of the court. KRS 30.060 (1942). Bar dues were limited to $3.00, and their collection and disbursement were made subject to regulation by the court. KRS 30.170 (1942).

KRS 30.060 was amended by Ch. 207, Acts of 1946, to require that all funds derived from application fees be remitted to the State Treasury. In 1962 KRS 30.170(1)(e) was amended by deletion of the limitation (then $10.00) upon the amount of bar dues to be fixed by the court on recommendation of the governing body of the bar association. Ch. 5, Acts of 1962. Thereaft-

er, and until adoption of the Judicial Amendment in 1975, these statutes remained substantially unchanged.

Whatever authority the court had possessed theretofore by statute with regard to admission to practice and regulation of the legal profession was superseded by Const. Sec. 116 as amended in 1975, the concluding sentence of which reads as follows: "The Supreme Court shall, by rule, govern admission to the Bar and the discipline of members of the Bar."

■ There can be no doubt that this constitutional amendment completely removed the subject from any legislative authority and rendered obsolete and ineffective the statutes pertaining to it. Strangely, nevertheless, at its 1976 regular session the General Assembly reenacted provisions authorizing the Supreme Court to appoint a board of bar examiners and to organize and govern the bar, and again requiring that admission fees be remitted to the state treasury. Ch. 58, Acts of 1976; KRS 21A.130, 21A.150, 21A.160, 21A.140. These statutory provisions are void because they purport to erect powers and limitations that no longer fall within the legislative province.

The root source of all power validly exercised by any officer or agency of the state government is, of course, its Constitution. Placing first things first, ours begins with a Bill of Rights consisting of 26 Sections, the last of which declares in substance that these rights shall prevail over and above all else and are not subject to the general powers of government.

The next two sections of the Constitution, entitled "Distribution of the Powers of Government," divide all governmental authority among "three distinct departments, and each of them to be confined to a separate body of magistracy, to wit: Those which are legislative, to one; those which are executive, to another; and those which are judicial, to another." Const.Sec. 27. This distribution of authority concludes with an unusually forceful command: "No person or collection of persons, being of one

of those departments, shall exercise any power properly belonging to either of the others, except in the instances hereinafter expressly directed or permitted." Const. Sec. 28.

Sections 29–62, incl., provide for the legislative branch of government and limit its powers. Sections 69–108, incl., provide for the executive branch of government and delegate certain specific and exclusive powers to its officers. Any further powers this branch of government may possess–that is, beyond those expressly delegated or necessarily implied by the Constitution itself– must be conferred upon it by the legislative branch, which has all governmental authority not delegated elsewhere and not prohibited by the Constitution.

Sections 109–124, incl., the Judicial Amendment of 1975, provide for the judicial branch of government and, as in the instance of the executive branch, delegate certain specific and exclusive powers to its officers and agencies. The hallmark of this particular subdivision appears in its first section, as follows: "The judicial power of the commonwealth shall be vested exclusively in one Court of Justice . . . . The court shall constitute a unified judicial system for operation and administration . . . ." Const.Sec. 109. Further on, Sec. 110(5)(b) states, "The chief justice of the commonwealth shall be the executive head of the Court of Justice and he shall appoint such administrative assistants as he deems necessary. . . . The chief justice shall submit the budget for the Court of Justice and perform all other necessary administrative functions relating to the court."

■ These references to administration and administrative functions do not appear in the Judicial Amendment by accident. Their purpose is to make it unmistakably clear that the judicial branch of this state government has exclusive authority to manage its own affairs. Significantly, whereas the Governor's authority with regard to the presentation of a biennial budget to the General Assembly is purely statutory, cf. KRS 45.030–45.050, the authority of the Chief Justice to submit the budget for the Court of Justice comes directly and expressly from the Constitution itself. Const.Sec. 110(5)(b). Hence that function can be neither assumed by nor delegated to the executive branch.

The constitutional check–and–balance relationship between the executive and judicial branches of the government consists of the provisions for filling vacancies in judicial offices and for the appointment of temporary substitutes when two or more justices of the Supreme Court decline or are unable to participate in the disposition of a cause pending before that court. Const. Secs. 118, 110(3). Those relationships between the legislature and judicial branches exist by virtue of Const.Secs. 110(4), 111(1), 112(2) and (3) and 113(2) and (3), pertaining to judicial districts and number of judges and justices; Const.Secs. 111(2), 112(5) and 113(6), pertaining to jurisdiction; and Sec. 120, which provides that the compensation of all judges and justices shall be fixed by the General Assembly and that all compensation and necessary expenses of the Court of Justice shall be paid out of the state treasury.

■ The purpose and significance of the judicial budget is that it provides a means by which the legislative body may assess how much it must appropriate from the treasury for the operation of the judicial system. Once it has made that appropriation, the authority for and responsibility of determining the necessity for and the propriety of expenditures from that source rest exclusively with the judicial branch itself, and are not subject to executive[1] or legislative regulation. Nevertheless, to the extent that it has appropriated funds from the general revenues of the state to the judicial branch of government the legislative body has a legitimate and necessary right to know how those funds have been spent. In short, the legislative body may require that the accounts so financed be audited.

1. *See In the Matter of County of Oneida v. Berle*, 49 N.Y.2d 515, 427 N.Y.S.2d 407, 404 N.E.2d 133 (1980).

■ At this point it is appropriate to consider the nature of the Auditor's office and the source and extent of its authority. This office, as a constitutional agency, first appeared in Sec. 25 of the third Constitution of Kentucky (1850), which provided: "A Treasurer shall be elected . . . and an Auditor of Public Accounts. . . . The duties and responsibilities of these officers shall be prescribed by law." The same provisions were carried into Secs. 91 and 93 of the fourth Constitution (1891) and continue in force today. As their powers are to be prescribed by law, and therefore must be conferred by the legislative body, these offices are subject to whatever limitations of authority apply to the legislative body itself. In other words, and in the context of the controversy with which we are here concerned, with respect to the judicial branch of government the Auditor cannot constitutionally be given any authority that the legislative body has no right to confer.

■ The authority upon which the Auditor relies in support of his right to audit the accounts of the Association is set forth in KRS Chapter 43. KRS 43.050(2)(a) directs him (or her) to audit the accounts "of all state agencies, all private and semi–private agencies receiving state aid or having responsibility for the handling of any state funds, the accounts, records and transactions of the budget units, and the general accounts of the state." KRS 43.010 defines a "budget unit" as any department or unit for which a separate appropriation or appropriations are made, and a "state agency" as any state officer, department, institution, person or functional group that is authorized to or does exercise any powers, duties or obligations of state government.

We find it unnecessary to determine, as did the Supreme Court of Washington in the *Matter of the Examination of the Washington State Bar Association*, 86 Wash.2d 624, 548 P.2d 310 (1976), that the Association and the Board of Bar Examiners do not fall within these statutory definitions. That is irrelevant. The real question is the extent to which they may validly be applied to the Court of Justice as a constitutionally separate branch of government.

■ As we have indicated, we have no doubt that the General Assembly has the authority to require an accounting of funds it has appropriated from revenues it has caused to be raised. What we have in this case, however, are funds that have not been collected pursuant to any statute and have not been appropriated by the legislative body and are not subject to legislative appropriation. Both the Association and the Board of Bar Examiners exist solely by virtue of rules of this court expressly and exclusively authorized by Const.Sec. 116. There is no constitutional authority by which they can be made accountable to either of the other two branches of government except for their stewardship of such funds or property as may come into their possession through these sources. Neither of those agencies has any such funds or property. Their funds and property are public funds and property because their official functions are entirely public in nature, but their accountability is to this court only, of which they are an integral part.

Another contention by the Auditor is that bar dues are essentially occupational license taxes, which ordinarily the legislature has the exclusive power to levy, and that regardless of whether Const.Sec. 116 grants direct authority in that respect to the Supreme Court or "merely delegates legislative discretion to determine the amount" of the dues, because of their very identity as license fees collected by governmental authority they are public funds and, like the statutory license fees collected by the Department of Fish and Wildlife Resources and the fees of various county officials collected pursuant to Const.Sec. 106, are subject to the authority granted by the Constitution to the Auditor. Again, however, this argument assumes authority in the Auditor that is not granted by the Constitution. That funds are raised by governmental authority and are therefore "public" does not necessarily subject their collection and disbursement to the activities of the Auditor. It would make just as much sense to say

that because these funds are "public" they can be used and disbursed only as directed by legislative appropriation. Such a result would open the floodgates to legislative control of the judicial branch of government, and that is exactly what the 1975 Judicial Amendment was designed to prevent.

Fees collected by the Department of Fish and Wildlife Resources are authorized entirely by legislative enactment. Cf. KRS 150.170 et seq. Indeed the Department itself is a creature of statute. KRS 150.021 et seq. Const.Sec. 106 expressly subjects the fees collected by county officials to legislative regulation. Hence all of those funds are subject to whatever authority the General Assembly sees fit to confer upon the Auditor, but funds raised under authority conferred by this court pursuant to its constitutional power to govern admission to the bar and the discipline of its members are not.

The Auditor has submitted an admirable brief in support of the contention that he has authority to audit the accounts of the Association. Among other things, he argues that the exercise of such authority would not interfere with the judicial function. What this argument overlooks, however, is that the 1975 Judicial Amendment extended the judicial function to include the administration of the business affairs of the judicial branch of government, and even though a post or performance audit by the Auditor might not actually "interfere" with that administrative function, certainly it would constitute an intrusion upon it. This intrusion need not be suffered, because appropriated funds are not involved. Experience teaches that a boundary not guarded will in time be lost.

*Raney v. Stovall,* Ky., 361 S.W.2d 518 (1962), and *Arnett v. Meade,* Ky., 462 S.W.2d 940 (1971), are cited in support of the Auditor's position. Both were decided before the adoption of the Judicial Amendment, and to a large extent the instructive commentary contained in them is obsolete.

In *Raney* the court held simply that the State Treasurer had standing to contest the legality of a warrant issued by the Department of Finance. Although the opinion refers to "the implied obligations" of the office, we construe that expression as connoting merely that a public official having public funds in his custody necessarily has authority to protect them against illegal dissipation. The same result had been reached in *Norman v. Kentucky Bd. of Managers,* 93 Ky. 537, 20 S.W. 901 (1892), holding that the Auditor, who then had the authority to issue warrants against the state treasury, was entitled to question the validity of a legislative act under which he was ordered to issue a warrant.

We do not by any means accede to the proposition that *Raney* somehow lends force to the argument that by virtue of its title alone, referring to "Public" Accounts, the office of the Auditor is invested with rights and powers that pervade the entire spectrum of state government. As we have previously demonstrated, the duties and responsibilities of the Auditor are those and only those legally prescribed by the legislature. Consequently, he has no inherent powers. For example, prior to the effective date of the Governmental Reorganization Act of 1936, KS 4618–68 et seq., the Auditor served only as the bookkeeper for the state. KS 4618–137 et seq. He had no authority or duty to conduct post or performance audits. These were the function of the State Inspector and Examiner. KS 1992b–59. The effect of the reorganization act was to transfer the duties of Auditor to the Department of Finance, to transfer the duties of the State Inspector and Examiner to the Auditor, and to abolish the office of State Inspector and Examiner. A clearer history of subjugation to the legislature cannot be found.

The bottom line of *Arnett v. Meade,* Ky., 462 S.W.2d 940 (1971), was its holding that an ancient but unrepealed statute (KRS 421.140) imposing limits on the punishment for contempt of court had become a material interference with the judicial function and for that reason was invalid. The opinion devotes a great deal of the discussion to the overlapping of legislative

and judicial functions. The sentence from which the Auditor's position in this case would draw nourishment is to the effect that "the legislature may put *reasonable* restrictions upon constitutional functions of the courts, provided that such restrictions do not *defeat* or *materially* impair the exercise of those functions." *Arnett, supra,* at 946. The correct principle, as we view it, is that the legislative function cannot be so exercised as to interfere unreasonably with the functioning of the courts, and that any unconstitutional intrusion is *per se* unreasonable, unless it be determined by the court that it can and should be tolerated in a spirit of comity. The converse also is true, and in *Lunsford v. Commonwealth,* Ky., 436 S.W.2d 512 (1969), this court recognized that its own rule authorizing imprisonment for failure to execute a peace bond was an unconstitutional infringement upon the legislative prerogative. And in *Raney, supra,* for the same reason, we declined the invitation to trespass upon the exclusive right of the Senate to determine the qualifications and disqualifications of its own members. Such an inquiry is, of course, of a judicial nature, but the Constitution excludes it from the judicial process.

■ Inevitably, there is and always will be a gray area in which a line between the legislative prerogatives of the General Assembly and the rule–making authority of the courts is not easy to draw. The policy of this court is not to contest the propriety of legislation in this area to which we can accede through a wholesome comity. There is, for example, the statute providing for the disqualification of judges, KRS 26A.015, as contrasted with SCR 4.300 Canon 3, C(1), in which the same subject–matter is included as a part of the Code of Judicial Conduct. There is also the matter of court costs and fees. See KRS 24A.270. Even the statutory creation of a small claims division within the structure of the constitutionally–established district court, KRS 24A.230, is not beyond the pale of an honest

difference of opinion. But we hold the General Assembly in the highest respect, and much prefer cooperation over conflict. It has done great work in accommodating the statutes to the new and hitherto–untried requirements of the 1975 Judicial Amendment, and to the extent that we are able to accept its judgments without leaving seeds of future jeopardy to the integrity of the judicial system we shall continue to do so. The point we make here is that the commentary in *Arnett* regarding legislative restriction upon judicial functions is and must be confined fundamentally to the area of comity.

The Association has had its financial records regularly audited by certified public accountants for many years.[2] Its books and records, except for what must be held in confidence incident to disciplinary proceedings, are open for inspection by the news media and by any legitimately–interested member of the public. For 45 years there was no effort or attempt by the Auditor's office to assume any authority or responsibility over them. Traditionally at least, the weight of history is against this new–found claim of right.

One remaining question might be asked— why not? In other words, why not comity in this instance? The answer is that there really is no necessity for it and there is good reason against it. Moreover, the legislature is not the real source of the pressure anyway. Without ascribing any questionable motive to the present incumbent or any particular one or more of his predecessors, we think it is appropriate to consider that the office of the Auditor is essentially political in nature and has not always been altogether unaffected by partisan political currents. In keeping with the letter and spirit of the 1975 Judicial Amendment it is the policy of this court, insofar as possible, to isolate the judicial system from the political arena.

At the present time we have 120 circuit clerks who collect some $3,000,000 per

2. The legislature has recognized such action as an acceptable substitute for the services of the

Auditor for counties. KRS 43.070(1)(b).

month for the general fund of the state. They are not regularly audited because the Auditor does not have a sufficient appropriation to make it possible. So, except for "spot" audits of selected offices the Auditor is not in a position to audit this, the greatest source of public revenue passing through the judicial system. We have some difficulty in comprehending how an audit of the Association, never before undertaken and not prompted by any source outside the Auditor's office itself, can be justified when the 120 clerks' offices cannot be served.

In a recent decision of the Court of Appeals it was held that the Kentucky Bar Center Headquarters, title to which is held by a board of trustees established by SCR 3.115, is nontaxable because it is public property under Const.Sec. 170. *Travis v. Landrum*, Ky.App., 607 S.W.2d 124 (1980). We have denied a motion for review of that decision for the reason that it reaches the correct result. *Ford v. The Board of Tax–Roll Corrections of Oklahoma County*, Okl., 431 P.2d 423 (1967); *State Bar of Michigan v. City of Lansing*, 361 Mich. 185, 105 N.W.2d 131 (1960).

There seems to be a rather prevalent misapprehension regarding the nature and function of the Association. It does not exist for the private benefit of the legal community. The members of the bar are entrusted with a privilege that places their duty of public service above their personal requirements and ambitions. The mission of the Association is to see to it that this trust is performed with fidelity to the high principles of their calling. This requires that the Association maintain a proper discipline of the bar, that it initiate and supervise appropriate means to insure a high standard of professional competence, and that it bear a substantial responsibility for promoting the efficiency and improvement of the judicial system itself. Without an arm such as the Association this court could not carry out its own responsibilities in those respects. As it is, the functioning of the Association in disciplinary and educational matters results in constant communication with this court and the Chief Justice in their supervisory capacities, entailing a consumption of time and effort that seems not to be realized by those not directly involved in the process.

In its motion for a review of the decision in *Travis* the Department of Revenue cited KRS 56.030, which requires that the Commonwealth be named as the grantee of any real property conveyed for the use of any of its agencies or officers. While the ownership of a building may not constitute "practice and procedure" within the meaning of KRS 447.154, it does come within the administrative authority of the Court of Justice and, as such, cannot be restricted or prohibited by statute.

The Department of Revenue also cited a ruling of the Internal Revenue Service to the effect that the Association has private as well as public purposes and for that reason donations to it are not deductible under Sec. 170(c)(1) of the Internal Revenue Code as charitable contributions. The answer to this is that the definition of terms within the federal hierarchy lie within the federal domain, and although we have no control of the IRS, the nature and functions of the Association are what this court, and not the IRS, says they are. There is no legitimate or authorized duality of purpose on the part of the bar association. And the comparison the Department of Revenue seeks to invoke between the Association and the Kentucky Medical Association and the Kentucky Dental Association is patently absurd. Neither of the latter organizations is created or governed by statute (as are the licensure boards for those professions), and neither, therefore, is subject to governmental limitation of its purposes. As a matter of fact, both are voluntary organizations, in which membership is not required of any individual practitioner.

In conclusion, it is our opinion that the Auditor has no legal authority with respect to the Association, and it is so ordered.

AKER, CLAYTON, LUKOWSKY, STEPHENS, STEPHENSON and STERNBERG, JJ., sitting.

All concur.

Entered November 26, 1980.

/s/ John S. Palmore
Chief Justice