John Y. BROWN, Jr., Governor of the
Commonwealth of Kentucky, et
al., Movants,

v.

Alben W. BARKLEY II, Commissioner of
Agriculture, Respondent.

Supreme Court of Kentucky.

March 5, 1982.

As Amended March 17, 1982.

Lawrence E. Forgy, Jr., Wyatt, Tarrant & Combs, Lexington, William H. Cull, J. Patrick Abell, Frankfort, for movants.

Julius Rather, Lexington, R. Hughes Walker, J. Michael Noyes, Frankfort, for respondent.

PALMORE, Chief Justice.

On January 14, 1981, the Governor of Kentucky issued an executive order (numbered 81–55) transferring various functions, personnel and funds from the Department of Agriculture (hereinafter called Agriculture) to another executive agency and, among other things, placing it and several other agencies within a newly-created Energy and Agriculture Cabinet. The Commissioner of Agriculture[1] thereupon brought suit challenging the validity of the order. The trial court adjudged it invalid on the ground that it was not authorized by KRS 12.025(1), the enabling statute pursuant to which it was issued. On appeal by the Governor the Court of Appeals held that the order did come within the literal authority of KRS 12.025(1) but was prohibited by a proviso added in 1980 to KRS 12.020, a related statute.

Our conclusion is that the trial court was correct in determining that KRS 12.025(1) does not authorize the transfer of functions, personnel and funds directed by the order. We have considered also whether the Governor nevertheless has constitutional power to effect such a reorganization regardless of the statute, and have determined that he does not.

Before discussing the merits it is necessary that we clear up a misunderstanding with regard to appellate practice. In the trial proceeding the Commissioner contended that even if KRS 12.025(1) purports to authorize the transfer, it is invalid as an unconstitutional attempt to delegate to the executive branch of government a power that is essentially legislative in nature and can be exercised only by the General Assembly itself. The trial court addressed that issue and held the statute valid, but determined that it does not authorize the transfer. The Court of Appeals declined to consider the constitutional issue because the Commissioner did not cross-appeal. We are moved to point out, however, that appeals are taken from *judgments*, not from unfavorable rulings as such. A party must be aggrieved by a judgment in order to appeal from it. Cf. *Miller v. Miller*, Ky., 335 S.W.2d 884, 886 (1960); *Civil Service Comm. v. Tankersley*, Ky., 330 S.W.2d 392, 393 (1959). A cross-appeal is appropriate only when the judgment fails to give the cross-appellant all the relief he has demanded or subjects him to some degree of relief he seeks to avoid. The relief sought by the Commissioner was an injunction against the enforcement of the executive order. The judgment gave him that relief. That the trial court decided the case on one of the grounds urged by the successful party while rejecting the other does nothing to diminish the relief he was granted. We recognize, of course, that a document styled as a "judgment" may embrace within its four corners opinions, observations, recitations or rulings leading to or in support of its operative effect, but in contemporary parlance it is the "bottom line" that is the ultimate judgment and source of aggrievement providing the basis for an appeal.

Some of our past opinions[2] suggesting the necessity of a cross-appeal in order for an appellee to bring an adverse ruling

---

1. Properly speaking, "Commissioner of Agriculture, Labor and Statistics." Const. Sec. 95. In the constitutional debates much discussion was devoted to the particular wording of this title. See Debates, Constitutional Convention, pp. 1365 et seq., (Ky., 1890).

2. See, for example, *Owensboro National Bank v. Department of Revenue*, Ky., 394 S.W.2d 461, 465 (1965), which in this respect seems incorrect.

of the trial court under review by an appellate court appear to have fostered confusion by failing to distinguish between those instances in which the judgment gives the appellee the ultimate relief for which he has contended and those in which the judgment gives him something less. In the latter case he cannot challenge the shortcomings of the judgment without a cross-appeal. He can, however, by way of bolstering the judgment against the possibility that the appellate court may accept the appellant's claim of error, make the point that he was nevertheless entitled to the judgment on a theory that was properly presented but erroneously rejected by the trial court. To cite a familiar example, if in a damage suit the judgment reflects a jury verdict in favor of the defendant, there is no reason why he cannot argue to the appellate court that certain errors raised on appeal by the losing plaintiff are immaterial because the defendant had moved for and was entitled to a directed verdict anyway. In short, "cross-appeals can be maintained only when the effect of the trial judgment is to place some obligation on appellee" [or, of course, to deny him something for which he has asked]. *Clark v. Wells-Elkhorn Coal Co.*, 215 Ky. 128, 284 S.W. 91, 93 (1926).

It was not necessary for Barkley to cross-appeal in order to preserve his contention that the statute is unconstitutional.

The centerpiece of this litigation is KRS 12.025(1), which originated in 1960 as part of an act reorganizing the executive branch of the state government.[3] This statute provides that the Governor may:

"(1) Establish, abolish or alter the organization of any agency or *statutory administrative department,* including changing the name of a department to explain more clearly the functions performed by it. Also included in this authority shall be permission to transfer functions, personnel, funds, equipment, facilities and records from one (1) department to another. Reorganization made under this section shall be set forth in an executive order, signed by the governor and filed in the office of the secretary of state, which shall explain the changes made and designate the functions, personnel, funds, equipment, facilities and records, as applicable, to be transferred. The governor shall recommend legislation to the next following session of the general assembly to confirm reorganizations effected under the provisions of this section." (Emphasis added.)

The term "statutory administrative department" used in KRS 12.025 (1) related directly to KRS 12.020, by which, as amended in the same legislation, the various executive and administrative agencies of the state were classified as (1) "Constitutional Administrative Departments," (2) "Statutory Administrative Departments," and (3) "Independent Agencies." The Governor and the Departments of State, Law, Treasury, Agriculture, Education, and Military Affairs were enumerated as the "constitutional" administrative departments. As may be observed, this designation included all of the departments corresponding with the offices created by Const. Sec. 91 except for the Auditor of Public Accounts, whose office was classified among the "Independent Agencies," and the Register of the Land Office, which had been abolished pursuant to Const. Sec. 94; and it included one, the Department of Military Affairs, which does not relate to any of the offices named in Const. Sec. 91 but obviously falls under the military powers vested in the Governor by Const. Sec. 75.

Clearly, when it was enacted in 1960 KRS 12.025(1) would not have applied to those departments, including Agriculture, that were classified in KRS 12.020 as "constitutional" rather than "statutory." Today, however, though KRS 12.025 remains substantially unaltered, KRS 12.020 has been so amended that the term "statutory administrative department" has become an anachronism.

Whereas in 1960 the executive departments and agencies enumerated in KRS 12.020 were classified as "constitutional," "statutory," and "independent agencies," at

---

3. Ch. 68, Art. XV, Acts of 1960.

the next regular session of the General Assembly[4] they were reclassified according to whether they were headed by *elected officers* or by *appointed officers.* In 1974 they were further reclassified as "Departments headed by elected officers," "Cabinet Departments headed by appointed officers," and "Other Departments headed by appointed officers,"[5] and through the amendments which have been enacted from that time until today this has remained the terminology by which KRS 12.020 classifies most of the administrative departments within the executive branch of government. The elected officers listed as such in KRS 12.020 are the Governor, Lieutenant Governor, Railroad Commissioner, and all of the officers named in Const. Sec. 91 except for the now-defunct Register of Lands.

In the massive reorganization statute enacted in 1974[6] the following sentence was added to KRS 12.020:

"Every authority, board, bureau, interstate compact, commission, committee, conference, council, office or any other form of organization shall be included in or attached to the Department or program cabinet in which they are included or to which they are attached by statute or executive order."

In 1980[7] the foregoing sentence was amended by addition of the following proviso, and this new language in KRS 12.020 is the basis on which the Court of Appeals held that the Governor cannot, under KRS 12.025, transfer functions, funds, personnel, etc., from Agriculture to another executive agency or department:

"Provided, however, that where the attached department or administrative body is headed by a constitutionally elected officer such attachment shall be solely for the purpose of dissemination of information and coordination of activities and shall not include any authority over the functions, personnel, funds, equipment, facilities, or

records of such department or administrative body."

It is argued by counsel for the Governor that Agriculture is in fact a statutory department, hence it is subject to the reorganizational authority specified by KRS 12.025. In that Const. Sec. 91 does no more than to create certain offices, by naming the officers to be elected to them, and does not expressly establish any department or organizational structure to be headed by those officers, we agree that the departments now headed by them are not truly "constitutional" departments.[8] In that sense, of course, all of the executive departments are statutory, but that does not answer the question in this case. The question is not whether Agriculture and the other departments categorized in the 1960 version of KRS 12.020 as "constitutional," but today as "headed by elected officers," are actually statutory departments, but whether that is what the General Assembly intended or intends for them to be considered; and whatever may be the correct definitions of "constitutional" and "statutory," it is an unavoidable conclusion that the word "statutory" as it appears in KRS 12.025 reflects the same legislative intent today as it did in 1960—that is, its purpose was to exclude those departments characterized in the 1960 act as "constitutional administrative departments" but renamed in the 1962 act and succeeding legislation as "departments headed by elected officers."

This distinction between purely statutory departments and agencies and those that have been established by the General Assembly under the supervision of the elective officers named in Const. Sec. 91 may very well suggest a lingering doubt on the part of the legislative body that it has the power to subject any of the constitutional officers, or the organizations it has placed under their supervision, to the superior authority

---

4. Ch. 106, Art. I, Acts of 1962.

5. Ch. 74, Art. I, Sec. 6, Acts of 1974. Interestingly enough, here again, in KRS 11.060 (Governor's general cabinet), appear the terms "constitutional and statutory administrative departments." And so the statute remains today.

6. Ch. 74, Acts of 1974.

7. Ch. 295, Sec. 2, Acts of 1980.

8. Agriculture is established by KRS Ch. 246.

of the Governor. Considering that the broad reorganization powers conferred upon the Governor under KRS 12.025 were enacted at a time or times when the General Assembly was generally regarded as more subservient to the wishes (or, in less polite terminology, the domination) of the Governor than it is today, we suspect that to be the case. On the other hand, it may be that the legislative body simply did not want the executive to have that much rein. In either event, the result is the same.

In discussing the extent of the Governor's power that is *not* dependent upon legislation it is necessary that we consider also the interrelation of constitutional powers with respect both to the Governor, the General Assembly, and the officers named in Const. Sec. 91. This is so because (1) to the extent that the Governor has any implied or inherent powers in addition to those the Constitution expressly gives him, it seems clear that such unexpressed executive power is subservient to the overriding authority of the legislature, and (2) the officers named in Const. Sec. 91 have only such powers and duties as are assigned to them by legislative enactment or by executive order expressly authorized by statute.

The office of Governor is established by Const. Sec. 69, which provides: "The supreme executive power of the Commonwealth shall be vested in a Chief Magistrate, who shall be styled the 'Governor of the Commonwealth of Kentucky.'" The powers and duties expressly conferred upon him are, in substance:

1. He is the commander-in-chief of the military forces and affairs of the state. Const. Sec. 75.
2. He may fill vacancies in office except as otherwise provided by the Constitution. Const. Sec. 76.
3. He may remit fines and forfeitures and grant reprieves and pardons. Const. Sec. 77.
4. He may require written information from the officers of the Executive Department upon any subject relating to the duties of their respective offices. Const. Sec. 78.
5. He shall from time to time report the state of the Commonwealth to the General Assembly and recommend to it such measures as he deems expedient. Const. Sec. 79.
6. He may call the General Assembly into special session and may adjourn the General Assembly for a period not exceeding four months if its two Houses cannot agree upon an adjournment. Const. Sec. 80.
7. "He shall take care that the laws be faithfully executed." Const. Sec. 81.

The offices of Treasurer, Auditor of Public Accounts, Register of the Land Office, Commissioner of Agriculture, Labor and Statistics, Secretary of State, Attorney-General, and Superintendent of Public Instruction were established by Const. Sec. 91, which provides:

"The duties of all these officers shall be such as may be prescribed by law, and the Secretary of State shall keep a fair register of and attest to all the official acts of the Governor, and shall, when required, lay the same and all papers ... relative thereto before either House of the General Assembly."

The only other reference to powers, duties or functions of these officers is in Const. Sec. 93, as follows:

"The duties and responsibilities of these officers shall be prescribed by law," etc.

It is interesting to observe that in dealing with the General Assembly and with the office of Governor the Constitution speaks in terms of "powers," but with regard to the Sec. 91 officers mentions only "duties" and "responsibilities."[9] Except for the Attorney-General, who has been held to possess by implication the powers inhering in the office as it existed at common law,[10] and except for the clerical duties placed on the Secretary of State by Const. Sec. 91

9. Cf. Secs. 29, 39, 49, 52, 54, 69, 76, 77, 91 and 93.

10. Subject, however, to the overriding authority of the General Assembly.

itself, the other officers named in Const. Sec. 91 have only such powers and responsibilities as are prescribed by statute. Cf. *Johnson v. Commonwealth*, 291 Ky. 829, 165 S.W.2d 820, 826 (1942); *Ferguson v. Chandler*, 266 Ky. 694, 99 S.W.2d 732, 736 (1936); *Ex Parte Auditor of Public Accounts*, Ky., 609 S.W.2d 682, 687 (1980). Whatever, therefore, the Commissioner of Agriculture may have in the way of functions, authority, funds or personnel can be removed to another agency at the will of the General Assembly.[11]

If the officers named in Const. Sec. 91 came into the world so naked of authority, one might well ask why they were not made appointive or, indeed, not mentioned at all. The answer, we think, though it may not have been articulated by the framers of the Constitution in their debates, is that these independent executive offices provide convenient receptacles for the diffusion of executive power. As the Governor is the "supreme executive power," it is not possible for the General Assembly to create another executive officer or officers who will not be subject to that supremacy, but it definitely has the prerogative of withholding executive powers from him by assigning them to these constitutional officers who are not amenable to his supervision and control.

Whether the Governor, in the exercise of his authority as the "supreme executive power of the Commonwealth" (Const. Sec. 69), can do the same thing in the absence of legislative authority is another matter. Though we are satisfied that the transfer of an existing, legislatively-created function from one executive agency or department to another is essentially an executive action, like the reassignment of troops or battle missions from one military command to another, and is not an exercise of legislative power by the chief executive, we do not believe that the chief executive has the power to do it without legislative sanction unless it is necessary in order for him to carry out a law or laws that the legislature has created without prescribing in sufficient detail how they are to be executed.

The powers given to the Governor by our Constitution closely resemble, for obvious historical reasons, those given to the President by the United States Constitution.[12] See Article 2, Secs. 2 and 3, Constitution of the United States. What has been said by respectable authority on the question of whether and to what extent the President has powers beyond those specifically set forth in the Constitution has instructive value in the proper interpretation of our own Constitution with respect to the powers of the chief executive.

Ever since the time of Washington and Hamilton there has been an unresolved difference of opinion whether the President has any power beyond that which is specified in Article 2 of the Constitution. Schwartz, Constitutional Law, 176–184 (2d ed. 1979). "A century and a half of partisan debate and scholarly speculation yields no net result but only supplies more or less apt quotations from respected sources on each side of any question. They largely cancel each other. And court decisions are indecisive because of the judicial practice of

---

11. The statement in *Covington Bridge Commission of the City of Covington*, 257 Ky. 813, 79 S.W.2d 216, 220 (1935) that the legislature "may not divest an office created by or named in the Constitution of its original and inherent functions" apparently assumed the presence of powers that do not exist. For the same reason, the admonition in *Johnson v. Commonwealth* that the legislature "cannot abolish the office ... indirectly by depriving the incumbent of all his substantial prerogatives or by practically preventing him from discharging the substantial things appertaining to the office" overlooks the fact that the legislature is under no compul-

sion to give such prerogatives or "substantial things" to the office in the first place.

12. That Article 2, Sec. 1, says "The executive power shall be vested in a president," whereas Sec. 69 of our Constitution vests the "supreme executive power" in the Governor probably reflects the fact that under our Constitution there are other constitutional officers in whom executive powers may be vested by the legislative body. Sec. 69 makes it clear that these officers are inferior to the Governor and that no other executive office can be created which will not also be inferior to that of the Governor.

dealing with the largest questions in the most narrow way." [13]

It is axiomatic that under our Constitution the General Assembly has all powers not denied to it or vested elsewhere by the Constitution. We do not doubt that if the General Assembly should pass a law that requires implementation, and appropriate funds for that purpose but omit specifying the manner in which it is to be carried out, the chief executive would be required to carry it out and have the right to choose the means by which to do it. That would not be so because of any implied or inherent power, however, but because it would be within the scope of authority and duty expressly conferred upon him by Const. Sec. 81.

In any event, whether the problem be largely semantic or otherwise, if it be postulated that the chief executive does possess implied or "inherent" powers, they would be subordinate to statute, as the inherent prerogatives of the Attorney-General were so held in *Johnson v. Commonwealth*, 291 Ky. 829, 165 S.W.2d 820 (1942). This means, we think, that when the General Assembly has placed a function, power or duty in one place there is no authority in the Governor to move it elsewhere unless the General Assembly gives him that authority. And in this case, as we have indicated already, KRS 12.025 does not give him that authority.

It is interesting as well as instructive to consider the constitutional contrast between the executive and judicial branches in their respective relationships to the legislative branch. Whereas the judicial branch must be and is largely independent of intrusion by the legislative branch, the executive branch exists principally to do its bidding.

The real power of the executive branch springs directly from the long periods between legislative sessions, during which interims the legislature customarily has left broad discretionary powers to the chief executive. It is ironic, but a historic fact of life, that in the past most chief executives have used this very power, given to them by the legislature, to influence the actions of individual legislators and thus exercise control over the legislative process itself. To put it mildly, it was not meant to be that way. It has been that way, however, for the simple reason that the legislature, either by choice or necessity, has conferred upon the executive branch more authority than was consistent with its own independence. Practically speaking, except for those conferred upon him specifically by the Constitution, his powers, like those of the executive officers created by Const. Sec. 91, are only what the General Assembly chooses to give him.

To round out this analysis of the respective powers and duties of the Governor, the General Assembly, and the officers established by Const. Sec. 91, we need to consider the relationship between the Governor and the Const. Sec. 91 officers. That the Const. Sec. 91 officers are to be elected by the people suggests that, whatever their duties, they are not answerable to the supervision of anyone else.[14] This inference finds support in that provision of our Constitution (Sec. 78) which empowers the Governor to *require information* in writing from the officers of the executive branch upon any subject relating to the duties of their offices. Had the framers of the Constitution intended the Governor to have any further authority over these officers, Sec. 78 would have been unnecessary and, indeed, an anomaly.

---

13. Jackson, J., concurring opinion in the Steel Seizure case, *Youngstown Co. v. Sawyer*, 343 U.S. 579 at p. 634, 72 S.Ct. 863 at p. 869, 96 L.Ed.2d 1153 (1952). No student of the subject should miss reading this as well as the extremely perceptive opinions filed by other members of the United States Supreme Court in this celebrated case.

14. We recognize that this may not be true with respect to *all* elective officers. The clerk of a court, for example, necessarily is subject to the supervision of the court. The office of county tax assessor, though elective, may be abolished by the General Assembly. Const. Sec. 104. The power to abolish, we think, includes the power to subject the office to the supervision of the Department of Revenue. Cf. *Allphin v. Butler*, Ky., 619 S.W.2d 483, 484 (1981).

■ That the General Assembly itself recognizes this degree of independence on the part of the Const. Sec. 91 officers appears to be the basis for the 1980 amendment [15] which adds to KRS 12.020 the proviso to the effect that when a department headed by a constitutionally elected officer is attached to another department or program cabinet it is only for informational and liaison purposes. That approach consists also with our view that the powers of transfer given to the Governor by KRS 12.025 do not affect the departments listed in KRS 12.020 as being headed by elected officers.

■ Before proceeding to one last point, we shall follow some advice from the late Dr. Karl Llewellyn and "tidy up" this opinion by summarizing the conclusions we have reached, as follows:

1. Agriculture is not a "statutory administrative department" within the meaning of KRS 12.025. Hence that statute is no authority for the transfer of any functions, funds, property or personnel from Agriculture by Executive Order 81-55.

2. The Governor has no constitutional or statutory power to transfer powers, duties, personnel, funds or property that have been assigned by the General Assembly to a department headed by an officer named in Const. Sec. 91.

3. The officers named in Const. Sec. 91 have no powers or duties not assigned to them by statute, except for the clerical duties placed on the Secretary of State by the Constitution and the common-law prerogatives of the Attorney-General that have not been removed or diminished by statute.

4. Whatever powers, duties, personnel, funds or property are given to a Sec. 91 officer by statute may be removed by statute and may be transferred by executive order if, but only if, such a transfer is authorized by statute.

5. Except for the informational duty specified in Const. Sec. 78, the officers named in Const. Sec. 91 are not and cannot

be placed under the control or supervision of the Governor.

■ The last major point that needs to be addressed in this case is raised by the Governor's contention that some of the functions transferred out of Agriculture by Executive Order 81-55 had been placed there initially by previous executive orders of the same type, hence if 81-55 is invalid so were the similar orders placing these functions with Agriculture in the first place. What this argument overlooks, however, is that these orders have been specifically ratified by the General Assembly, No. 76-664 by Ch. 155, Sec. 166, Acts of 1978, No. 79-1040 by Ch. 295, Sec. 93, Acts of 1980, and No. 79-834 by statutory amendment of KRS 246.030 in Ch. 295, Sec. 84, Acts of 1980.

KRS 12.025(1) requires that when the Governor has ordered any reorganizational adjustments under this statute he "shall recommend legislation to the next following session of the general assembly to confirm reorganizations effected under the provisions of this section."

Our conclusion is that these confirming statutes render moot the question of whether the orders were valid in the first instance, just as a similar statute, if enacted in the 1982 session of the General Assembly, would serve to ratify and validate Executive Order 81-55.

■ It is argued further that the proviso added to KRS 12.020 in 1980 necessarily connotes that a department headed by a constitutional officer can be attached to a cabinet by executive order. We do not agree. KRS 12.020 expressly refers to attachment by statute or by executive order. Agriculture has been statutorily attached to the Cabinet for Development since 1974. See Ch. 74, Art. VII, Sec. 4, Acts of 1974, which is reflected by the current listing of Agriculture in KRS 12.020 under both "Departments headed by elected officers" and

---

**15.** Ch. 295, Sec. 2, Acts of 1980.

"Cabinet departments headed by appointed officers." [16]

The judgment of the Franklin Circuit Court is affirmed.

PALMORE, C. J., and AKER, CLAYTON, STEPHENS, STEPHENSON and STERNBERG, JJ., sitting.

All concur.

---

**16.** This statute confirmed Executive Orders 72–1167 and 73–485, which had created the Development Cabinet and designated the chief officer of Agriculture as a member.