RENDERED: JUNE 25, 2026
TO BE PUBLISHED

# Supreme Court of Kentucky

2024-SC-0228-DG

ANDY BESHEAR, IN HIS OFFICIAL           APPELLANTS
CAPACITY AS GOVERNOR OF THE
COMMONWEALTH OF KENTUCKY;
AND DAVID KAREM, IN HIS OFFICIAL
CAPACITY AS A MEMBER OF THE
EXECUTIVE BRANCH ETHICS
COMMISSION

|  | ON REVIEW FROM COURT OF APPEALS |
|---|---|
| V. | NO. 2022-CA-0837 |
|  | JEFFERSON CIRCUIT COURT NO. 22-CI-002228 |

RUSSELL COLEMAN, IN HIS OFFICIAL        APPELLEES
CAPACITY AS ATTORNEY GENERAL
OF THE COMMONWEALTH OF
KENTUCKY; MICHAEL G. ADAMS, IN
HIS OFFICIAL CAPACITY AS
KENTUCKY SECRETARY OF STATE;
ALLISON BALL, IN HER OFFICIAL
CAPACITY AS STATE AUDITOR OF
PUBLIC ACCOUNTS; JONATHAN
SHELL, IN HIS OFFICIAL CAPACITY
AS COMMISSIONER OF THE
DEPARTMENT OF AGRICULTURE;
EXECUTIVE BRANCH ETHICS
COMMISSION; LEGISLATIVE
RESEARCH COMMISSION; AND MARK
H. METCALF, IN HIS OFFICIAL
CAPACITY AS KENTUCKY STATE
TREASURER

AND

2024-SC-0254-DG

JONATHAN SHELL, IN HIS OFFICIAL                                    APPELLANTS
CAPACITY AS COMMISSIONER OF THE
DEPARTMENT OF AGRICULTURE;
COMMONWEALTH OF KENTUCKY, EX REL.
ATTORNEY GENERAL RUSSELL COLEMAN;
MARK LYNN, IN HIS OFFICIAL CAPACITY
AS CHAIRMAN OF THE STATE FAIR BOARD;
DAVID W. OSBORNE, IN HIS OFFICIAL
CAPACITIES AS A MEMBER OF THE STATE
FAIR BOARD AND SPEAKER OF THE
KENTUCKY HOUSE OF REPRESENTATIVES;
AND BERTRAM R. STIVERS, II,
IN HIS OFFICIAL CAPACITIES
AS A MEMBER OF THE STATE FAIR BOARD
AND PRESIDENT OF THE KENTUCKY
STATE SENATE


                        ON APPEAL FROM COURT OF APPEALS
V.              NOS. 2021-CA-1459, 2021-CA-1503, & 2022-CA-0020
                    JEFFERSON CIRCUIT COURT NO. 21-CI-002234


ANDY BESHEAR, IN HIS OFFICIAL                                       APPELLEES
CAPACITY AS GOVERNOR; AND
SECRETARY LINDY CASEBIER, IN HIS
OFFICIAL CAPACITIES AS SECRETARY
OF THE KENTUCKY TOURISM, ARTS
AND HERITAGE CABINET, AND AS A
MEMBER OF THE STATE FAIR BOARD


AND
                                2024-SC-0256-DG

ANDY BESHEAR, IN HIS OFFICIAL                                      APPELLANTS
CAPACITY AS GOVERNOR; AND
SECRETARY LINDY CASEBIER, IN HIS
OFFICIAL CAPACITIES AS SECRETARY
OF THE KENTUCKY TOURISM, ARTS, AND
HERITAGE CABINET, AND AS A MEMBER
OF THE STATE FAIR BOARD

2

JONATHAN SHELL, IN HIS OFFICIAL                    APPELLEES
CAPACITY AS COMMISSIONER OF THE
DEPARTMENT OF AGRICULTURE;
COMMONWEALTH OF KENTUCKY, EX REL.
ATTORNEY GENERAL RUSSELL COLEMAN;
MARK LYNN, IN HIS OFFICIAL CAPACITY
AS CHAIRMAN OF THE STATE FAIR BOARD;
DAVID W. OSBORNE, IN HIS OFFICIAL
CAPACITIES AS A MEMBER OF THE STATE
FAIR BOARD AND SPEAKER OF THE
KENTUCKY HOUSE OF REPRESENTATIVES;
AND BERTRAM R. STIVERS, II, IN HIS
OFFICIAL CAPACITIES AS A MEMBER OF
THE STATE FAIR BOARD AND
PRESIDENT OF THE KENTUCKY
STATE SENATE

**OPINION OF THE COURT BY JUSTICE KELLER**

**REVERSING IN PART AND AFFIRMING IN PART AS MODIFIED**

These consolidated cases arise from challenges brought by the Governor

of the Commonwealth against the Attorney General, the Commissioner of

Agriculture, the Executive Branch Ethics Commission ("EBEC"), the Kentucky

State Fair Board ("Fair Board"), and other state officials responsible for

implementing recent legislative enactments altering the structure of executive

boards.  The disputes center on House Bill ("HB") 334 and HB 518, through

which the General Assembly redistributed appointment authority among the

Governor, the Attorney General, the Commissioner of Agriculture, the Auditor

of Public Accounts, and other constitutional officers, while modifying oversight

of the Executive Branch Ethics Commission and the Kentucky State Fair

Board.  The Governor contends that these enactments impermissibly intrude

3

upon the executive power vested in the office, while the Appellees maintain that the Legislature acted within its constitutional authority to prescribe the manner of appointment for statutory offices. The question presented is not whether the Legislature may participate in shaping the composition of statutory bodies. It may. The question is whether it may do so in a manner that restructures executive authority such that the supreme executive officer no longer retains sufficient control to ensure the faithful execution of the laws.

## FACTUAL AND PROCEDURAL BACKGROUND

During the 2021 Regular Session of the General Assembly, HB 518 was introduced and referred to committee for consideration. The bill proceeded through both chambers, where it was amended and passed by the House and Senate. It was presented to the Governor, who returned it with a veto. The General Assembly thereafter reconsidered the measure and, pursuant to its constitutional authority, voted to override the veto. HB 518 was enacted into law and became effective in accordance with its terms as Kentucky Revised Statutes ("KRS") 247. The Governor, joined by the Secretary for the Kentucky Tourism, Arts, and Heritage Cabinet, subsequently filed an action in Jefferson Circuit Court challenging the constitutionality of HB 518.

HB 518 ("Fair Board Act") reorganizes the Fair Board by altering the composition and appointment structure of its board of directors, which consists of fifteen voting members. The Fair Board Act transfers a majority of the appointment authority—eight members—to the Commissioner of Agriculture, while the Governor retains authority to appoint the remaining

4

seven members. It also designates the President of the Senate and the Speaker of the House, or their designees, as *ex officio*, nonvoting members of the Board.

The Fair Board Act establishes the Board as an independent de jure municipal corporation attached to the Tourism, Arts, and Heritage Cabinet for administrative purposes, requires it to provide reports and financial disclosures, and authorizes the Board's voting members to elect their own chair and officers. In addition, the Fair Board Act includes transition provisions affecting the timing and replacement of expiring terms, limiting the Governor's ability to fill certain vacancies during implementation of the new structure.

Later, during the 2022 Regular Session of the General Assembly, the subject of the additional challenge herein was created via HB 334. HB 334 ("EBEC Act") restructures the Executive Branch Ethics Commission by redistributing appointment authority. Initially, the board was composed of five gubernatorially appointed members with staggered, four-year terms. Among the changes, EBEC would expand from a five-member to a seven-member body. KRS 11A.060(2). The Governor would make two appointments, while the Attorney General, Agriculture Commissioner, Treasurer, Auditor, and Secretary of State (together, "the Constitutional Officers") would each make one appointment. KRS 11A.060(2)(a-e). Only the Constitutional Officer who appointed the EBEC member could remove him or her. KRS 11A.060(7). Additionally, HB 334 terminated the unexpired terms of the current members and provided for some shorter terms of certain initial members so that members of the EBEC board would ultimately have staggered, four-year terms.

5

KRS 11A.060(3). Lastly, it prevents any reorganization of itself "except by statute." KRS 11A.060(11).

The Commission retains its statutory role overseeing ethical conduct for thousands of executive branch officials and employees, including administering financial disclosure requirements, investigating complaints, and enforcing the Executive Branch Code of Ethics, but the authority to select and remove its members would be divided among six independently elected officers.

Although enacted in different legislative sessions, both measures employ similar structural mechanisms to redistribute appointment authority within executive entities. The procedural history reflects the constitutional conflict.

In *Coleman v. Beshear*, the Franklin Circuit Court held that the EBEC Act unconstitutionally fragmented executive authority. The Court of Appeals reversed, concluding that the Legislature's authority under Section 93 permitted the redistribution of appointment power. In *Shell v. Beshear*, the Franklin Circuit Court likewise invalidated portions of the Fair Board Act, and the Court of Appeals affirmed that result in part, though on narrower grounds. These decisions present a direct conflict regarding the scope of legislative authority and the meaning of executive power under the Kentucky Constitution.

We granted discretionary review to resolve that conflict and to clarify the constitutional boundaries governing appointment structures within the executive branch. The question is not whether the Governor must control every aspect of executive action, but whether the statutory structure preserves

6

a constitutionally sufficient chain of accountability through which the Governor may fulfill his or her duty to ensure faithful execution.

The Kentucky Constitution answers that question through its own structure. Sections 27 and 28 mandate a strict separation of powers among the legislative, executive, and judicial branches. Section 69 vests the "supreme executive power" in the Governor, and Section 81 commands that he "shall take care that the laws be faithfully executed." Section 93 permits the General Assembly to prescribe the "manner" of appointment of inferior officers. These provisions must be read together. The Legislature's authority to prescribe appointment mechanisms exists within—and not apart from—the Constitution's structural allocation of power.

For the reasons that follow, we hold that the statutory schemes at issue exceed the Legislature's authority because they restructure executive governance in a manner that eliminates meaningful executive supervision, in violation of Sections 27, 28, 69, and 81 of the Kentucky Constitution.

## ANALYSIS

"Our present constitution contains explicit provisions which, on the one hand, mandate separation among the three branches of government, and on the other hand, specifically prohibit incursion of one branch of government into the powers and functions of the others." *Legislative Research Comm'n ex rel. Prather v. Brown*, 664 S.W.2d 907, 912 (Ky. 1984) [hereinafter *LRC*]. Section

7

93 addresses procedure. Sections 27[1] and 28[2] impose structural limits. Section 69[3] vests the "supreme executive power" in the Governor. Additionally, Section 81 commands that the Governor "shall take care that the laws be faithfully executed." Procedure does not override structure.

This case does not ask whether executive authority may be distributed. Kentucky's Constitution plainly permits such distribution. It asks whether it may be distributed in a manner that destroys the accountability necessary to give effect to Sections 69 and 81. We conclude that it may not.

The question is not executive supremacy, but constitutional structure. Once the constitution vests executive authority in the executive branch, the General Assembly may not reengineer that structure so that accountability is dissolved. To redesign and displace or diffuse authority unsettles the rigid separation embodied in Sections 27 and 28. The constitution does not require that the Governor personally exercise all executive authority. It does require that the structure of executive governance preserve a chain of accountability

---

[1] "The powers of the government of the Commonwealth of Kentucky shall be divided into three distinct departments, and each of them be confined to a separate body of magistracy, to wit: Those which are legislative, to one; those which are executive, to another; and those which are judicial, to another." KY. CONST. § 27 (emphasis added).

[2] "No person or collection of persons, being of one of those departments, shall exercise any power properly belonging to either of the others, except in the instances hereinafter expressly directed or permitted. KY. CONST. § 28 (emphasis added).

[3] "The supreme executive power of the Commonwealth shall be vested in a Chief Magistrate, who shall be styled the "Governor of the Commonwealth of Kentucky." KY. CONST. § 69 (emphasis added).

8

sufficient to allow the discharge of the Governor's constitutional duty to ensure the faithful execution of the laws. Accountability cannot survive fragmentation.

Kentucky's separation-of-powers provisions were adopted as mandatory structural restraints—not flexible standards to be balanced against legislative preference. The framers rejected blended models of governance and imposed categorical divisions. Separation of powers is not a policy factor. It is a boundary.

HB 518 and HB 334 leave no sufficient appointment and removal authority to ensure faithful execution by the constitutional supreme executive. A constitutional duty without meaningful supervisory power is not accountability—it is ceremony. The constitution does not create ceremonial executives. It creates accountable ones. Section 93 authorizes legislative prescription of appointment mechanisms, but it does not permit the General Assembly to fragment executive authority in a manner that defeats accountability within the executive branch. Conversely, while Sections 69 and 81 require that executive power remain capable of faithful execution, they do not confer upon the Governor exclusive control over all statutory appointments.

Relevant to this, the State Fair Board hosts dozens of internationally recognized conventions, expositions, and events that attract tourism, millions of dollars in revenue, and numerous other economic benefits to the Commonwealth. The Governor's ability to effectively lead executive branch functions relating to economic development of the Commonwealth is significantly hindered by the appointment scheme set forth in HB 518.

9

Similarly, the Governor's role as supreme authority over the executive branch and his or her duty to ensure faithful execution of the laws is also significantly undercut by the appointment scheme set forth in HB 334. Thus, while there may be appointment schemes to other executive branch boards that pass constitutional muster, we conclude that HB 518 and HB 334 unconstitutionally interfere with the Governor's powers and duties under Sections 69 and 81.

## I. STRUCTURAL LIMITS GOVERN LEGISLATIVE AUTHORITY

The Constitution is not a collection of isolated clauses. It is an integrated structure. Section 93 permits the Legislature to prescribe the manner of appointment of inferior officers. But Sections 27 and 28 impose categorical limits on how far that prescription may go.

The structure at issue will not operate only under present leadership. It will provide the architecture that must be occupied by present and future occupants. Constitutional structure does not fluctuate with circumstances; it is designed precisely to remain stable when circumstances do not. Separation of powers protects against the concentration or diffusion of authority regardless of who holds office. Its safeguards apply symmetrically, not situationally. Constitutions exist precisely because political advantage is fleeting. If structural safeguards bend whenever power tempts them, they will not stand when they are needed most.

As this Court explained in *Legislative Research Commission v. Brown*, Kentucky's Constitution adopts a "double-barreled" separation of powers—

10

affirmatively dividing authority and negatively prohibiting encroachment. 664 S.W.2d 907, 911–12 (Ky. 1984). That structure controls.

While statutes are entitled to a presumption of constitutionality, that presumption does not permit courts to uphold enactments that structurally contravene express constitutional boundaries. HB 334 and HB 518 disperse appointment authority across multiple constitutional officers, fragmenting removal authority accordingly. The Governor does not appoint a majority. The Governor does not control removal. And no sufficient chain of accountability exists through which the Governor may fulfill the constitutional duty to ensure faithful execution.

That is not prescription of "manner." It is redistribution of power. The defect lies not in dispersal alone, but in dispersal combined with the absence of meaningful supervisory authority. The constitution permits variation in appointment without the elimination of accountability.

## II. EXECUTIVE POWER REQUIRES MEANINGFUL SUPERVISION

Section 69 vests the "supreme executive power" in the Governor. Section 81 requires that the Governor ensure the faithful execution of the laws. These provisions presuppose that executive authority includes the power to supervise those who execute the law. A constitutional duty without corresponding authority is illusory. Without the ability or authority to direct, discipline, or remove those charged with execution, the duty to "take care" becomes ceremonial.

11

It is true that removal authority must be expressly conferred. *Votteler v. Fields*, 23 S.W.2d 588 (Ky. 1926). But the constitution forbids a statutory structure in which no sufficient removal authority exists to ensure accountability in the supreme executive. Supervision without removal is not supervision—it is observation. The fact that the Governor appoints some members or may seek judicial relief does not establish the authority necessary to ensure faithful execution of his or her executive duties. Those mechanisms provide participation, information, and access. They do not preserve the chain of accountability through which the Governor must discharge the duty imposed by Section 81.

The constitution does not permit structural convenience. Section 27 divides governmental power into three distinct departments. Section 28 forbids one department from exercising power properly belonging to another. Those provisions are not symbolic but structural restraints. Section 81 commands the Governor "shall take care that the laws be faithfully executed." That command presupposes something indispensable: executive authority capable of supervision and control.

A government cannot function through a constellation of uncoordinated officers. Executive authority requires a central leader, not a diffusion of officers operating without meaningful supervision. Unlike the dissent, we decline to conflate the Attorney General's authority to enforce the law with the Governor's duty to ensure that the laws are faithfully executed. They are not the same. The Attorney General, like the Treasurer, Secretary of State,

12

Commissioner of Agriculture, and other constitutional officers, exercises important powers assigned to that office by the Constitution and laws of the Commonwealth. But if the existence of authority within those offices were sufficient to satisfy Section 81, then the Governor's unique constitutional duty would have no independent meaning. Under that reasoning, the Attorney General's enforcement authority could substitute for the Governor's duty. Likewise, the Treasurer's authority over public funds could substitute for it, or the Secretary of State's authority over elections and public records, for that matter. The Constitution contemplates no such interchangeability of constitutional responsibilities. The Constitution assigns important responsibilities to multiple executive officers, but it assigns only one officer the obligation to ensure faithful execution across the entire executive branch.

HB 518 and HB 334 disperse appointment authority over executive boards, the Ethics Commission, and the State Fair Board, in a manner that deliberately fragments executive supervision. The Governor is left without meaningful authority over the execution of laws entrusted to these entities, insulating those entities from executive accountability. This is not mere legislative prescription under Section 93. Section 93 allows the Legislature to prescribe the manner of appointment of inferior officers.[4] That is strictly

---

[4] Section 93 of the Kentucky Constitution, titled "Succession of elected Constitutional State Officers; duties; inferior officers and members of boards and commissions," reads "The Treasurer, Auditor of Public Accounts, Secretary of State, Commissioner of Agriculture, Labor and Statistics, and Attorney General shall be ineligible to reelection for the succeeding four years after the expiration of any second consecutive term for which they shall have been elected. The duties and responsibilities of these officers shall be prescribed by law, and all fees collected by

13

procedural and must be read in harmony with Sections 27 and 28.  It does not authorize the Legislature to restructure executive power in a manner that eliminates a constitutionally sufficient chain of accountability for the faithful execution of the laws.  Sections 27 and 28 govern structure.  Section 93 governs method.  Structure controls.

> The framers of Kentucky's four constitutions obviously were cognizant of the need for the separation of powers. Unlike the federal constitution, the framers of Kentucky's constitution included an express separation of powers provision. They were undoubtedly familiar with the potential damage to the interests of the citizenry if the powers of government were usurped by one or more branches of that government. Our present constitution contains explicit provisions which, on the one hand, mandate separation among the three branches of government, and on the other hand, specifically prohibit incursion of one branch of government into the powers and functions of the others. Thus, our constitution has a double-barreled, positive-negative approach:
>
> Section 27 *The powers of the government of the Commonwealth of Kentucky shall be divided into three distinct departments, and each of them be confined to a separate body of magistracy*, to wit: Those which are legislative, to one; those which are executive, to another; and those which are judicial, to another.
>
> (Emphasis added.)
>
> Section 28 No person or collection of persons, being of one of those departments, shall exercise any power properly belonging to either of the others, except in the instances hereinafter expressly directed or permitted.
>
> Subsequent provisions of the Constitution proceed logically and consistently with the policy established in Sections 27 and 28 that grant powers to the three branches of government. Section 29 vests the legislative power in the

---

any of said officers shall be covered into the treasury. Inferior State officers and members of boards and commissions, not specifically provided for in this Constitution, may be appointed or elected, in such <u>manner</u> as may be prescribed by law, which may include a requirement of consent by the Senate, for a term not exceeding four years, and until their successors are appointed or elected and qualified." (emphasis added).

General Assembly, Section 69 vests the executive power in the Governor.

*LRC,* 664 S.W.2d at 911–12.

**HB 334 Fractures Executive Authority**.  That Kentucky employs multiple constitutional executive officers does not negate the Constitution's vesting of "supreme executive power" in the Governor; diffusion among officers is permissible, but dissolution of accountability is not. KY. CONST. § 69.  Section 93 permits the Legislature to prescribe the manner of appointment, including the identity of appointing authorities, but it does not authorize the Legislature to exercise that power in a way that defeats the Constitution's structural allocation of executive authority.  This Court does not suggest that the Governor must control all executive decision-making, only that the Constitution does not permit a structure in which no chain of accountability retains sufficient authority to ensure faithful execution.

HB 334 disperses appointment power across multiple constitutional officers and fragments removal authority accordingly.[5]  That is not "manner." That is redistribution.  Executive power includes supervision. (KY. CONST. §§ 81, 69).  This Court has recognized that removal authority does not arise by implication from appointment but must be explicit.  *See Votteler v. Fields,* 23 S.W.2d 588 (Ky. 1926).  But the question here is not whether appointment implies removal; it is whether the constitution's express command that the

---

[5] KRS 11A.060(7) as amended by HB 334 reads, "Members of the commission shall be removed by the appointing authority who appointed him or her."

15

Governor ensure faithful execution can be rendered ineffective by statutory design. A constitutional duty without corresponding supervisory authority would be illusory. The statutory scheme of HB 334 fails to account for the practical reality of its application. Executive supervision requires meaningful control. This statute's design deprives the Governor of both removal authority and majority appointment control, leaving him or her without meaningful supervisory tools to discharge the Section 81 duty. The constitution does not assign responsibility while permitting the Legislature to eliminate the tools necessary to discharge it.

Section 69 vests the "supreme executive power" in the Governor. Section 81 commands that the Governor "shall take care that the laws be faithfully executed." These provisions are not ornamental. The duty to ensure faithful execution presupposes authority sufficient to make that duty real. A constitutional command without corresponding supervisory power would reduce the executive to an observer rather than an officer. Meaningful execution requires meaningful control. Meaningful control relies upon the ability to direct, discipline, or remove those charged with execution, without which the structural design embodied in Sections 69 and 81 is defeated. This conclusion does not rest on implied powers, but on the structural relationship between express constitutional provisions, which require that the duty imposed by Section 81 be matched by authority sufficient to discharge it.

This case does not concern whether the Governor possesses a general power to appoint inferior officers. It concerns whether the Legislature may

structure executive authority so that no chain of accountability remains to ensure the faithful execution of the laws.

The historical limitation of some appointment power does not authorize the elimination of executive accountability. The 1850 constitution provided, for the first time, for the direct election by the people:

> A treasurer shall be elected by the qualified voters of the State, for the term of two years; and an Auditor of Public Accounts, Register of the Land Office, and Attorney General, for the term of four years. The duties and responsibilities of these officers shall be prescribed by law: Provided, that inferior State officers, not specially provided for in this Constitution, may be appointed, or elected, in such manner as shall be prescribed by law, for a term not exceeding four years.

This was carried through to our present constitution, which, while continuing to distribute authority among constitutional officers, specifically retained Sections 69 and 81, preserving the Governor's role as the Commonwealth's supreme executive and the officer responsible for ensuring the faithful execution of the laws. The Constitution does not require appointment or removal authority take any particular form. It does require that it exist in substance.

In *Yeoman v. Commonwealth Health Policy Board*, the Kentucky General Assembly enacted sweeping healthcare reform legislation, creating entities like the Health Policy Board and Health Purchasing Alliance. 983 S.W.2d 459 (Ky. 1998). Members of these bodies were appointed by the Governor, and the governing statute vested appointment authority exclusively in the Governor, although opponents alleged that outside organizations had influenced the selection process. The issue was whether statutory schemes allowing outside

17

influence in nominations and structuring of executive boards violated Sections 27, 28, or 69 by improperly delegating executive power or limiting the Governor's authority.  That scheme was held valid because the Governor retained ultimate appointment authority.

Further, *Kentucky Association of Realtors, Inc. v. Musselman* decided whether requiring the Governor to appoint from a list provided by a private organization violated Section 69 by restricting executive appointment authority.  817 S.W.2d 213 (Ky. 1991).  Because the governor could reject the entire list, demand a new list, and continue rejecting all names submitted until the list included a person whom the Governor deems suitable, the appointment power remained with the Governor.  The statute was found constitutional because it did not control executive decision-making or allow for the removal of executive discretion but merely demonstrated a tolerance of procedural constraints.

Additionally, Section 76 confirms the opposite of what Appellants suggest.  That provision addresses a narrow and specific circumstance—the temporary filling of vacancies in offices created by the Constitution—and expressly operates "except as otherwise provided."  It is not a general grant of executive authority and does not define the scope of the Governor's supervisory power.  The question here is not who may fill a vacancy, but whether the Legislature may structure executive authority absent sufficient control to ensure the faithful execution of the laws, ending with the supreme constitutional executive.  The transition provision barring the Governor from filling voting-member terms expiring in 2021 suffers from the same

18

constitutional defect. It was not a neutral timing rule but operated as part of the statutory design transferring effective appointment control away from the Governor.

HB 334 fractures executive authority and breaks the chain of executive accountability that Sections 27, 28, and 81 were designed to preserve. Separation of powers does not allow that.

**HB 518 Embeds Legislative Proximity to Execution.** HB 518 declares the Fair Board "accountable" to the General Assembly.[6] But separation of powers guards against structural proximity to execution—not merely overt legislative control.

This Court struck down the Legislative Research Commission's attempt to review, approve, or otherwise influence executive branch actions. *LRC*, 664 S.W.2d at 930-31. Our precedent has warned against such "latitudinous construction" – an overly expansive reading of legislative authority that would "destroy the separation of the powers of government" in *Sibert v. Garrett*, 246 S.W. 455, 457 (Ky. 1922), and recognized that the Legislature cannot exercise executive functions even if it created the office in *Pratt v. Breckinridge*, 65 S.W. 136 (Ky. 1901).

---

[6] KRS 247.100(4) as amended by HB 518 reads, "It is the intent of the General Assembly that the State Fair Board shall be accountable to the Governor, the Commissioner of Agriculture, the General Assembly, and the people of the Commonwealth through a system of audits, reports, and thorough financial disclosures."

Early cases such as *Pratt* and *Sibert* recognized that separation of powers in Kentucky is structural, not merely functional.  Whether or not those cases addressed different factual circumstances, they reflect a consistent principle: that one branch may not exercise power in a manner that displaces the constitutional function of another.  That principle was reaffirmed—not altered—by *LRC*. 664 S.W.2d at 912.

Constitutional boundaries must be enforced even when the Legislature acts within broad authority, as this Court has repeatedly emphasized structural enforcement over functional tolerance.  *Commonwealth ex rel. Stephens v. S. Cent. Bell Tel. Co.*, 545 S.W.2d 927, 931 (Ky. 1976).[7]  The constitution permits legislative oversight through reporting and appropriations but not a statutory scheme that displaces executive supervision while rhetorically tethering the entity to the Legislature.

*LRC* condemned indirect mechanisms that enabled legislative participation in executive governance.  664 S.W.2d at 918-20.  While reporting and audit requirements are constitutionally permissible exercises of legislative oversight, a statutory scheme that strips the Governor of appointment **and** removal authority while declaring the entity accountable to the General

---

[7] The Legislature enacted a law allowing the courts to "vacate or set aside orders or provide injunctive relieve in the manner and upon the terms, 'provided by law.' . . . We read the legislative mandate as directing us to keep our judicial fingers out of the ratemaking pie except to the degree that the constitutions require our intervention." *Stephens,* 545 S.W.2d at 931.

20

Assembly displaces executive supervision for legislative influence. The constitution permits oversight; it does not permit substitution.

When the Legislature removes gubernatorial majority appointment, removes gubernatorial removal authority, insulates the board from executive direction, and then declares the board "accountable" to the General Assembly, it creates a body that is functionally independent of the constitutional executive and rhetorically tethered to the Legislature. That is structural realignment of accountability. HB 518 structurally blurs the lines that legal precedent insists remain distinct.

The conclusion does not change because legislative members are designated "nonvoting." The exercise of executive power is not confined to formal votes. Structural placement within an executive body itself constitutes participation in the execution of the law. LRC rejected not only direct legislative control, but also indirect mechanisms that permit legislative involvement in executive governance. 664 S.W.2d at 918-20. The constitution forbids legislative proximity to execution—not merely legislative domination of it.

Legislators cannot sit *ex officio* on executive boards. But if legislators cannot sit *ex officio* on executive boards, **neither can they embed themselves** through structural "accountability" language that invites oversight beyond appropriations and reporting. The ambiguity embedded in the statute lies waiting to be exploited in ways that blur the constitutional boundary between legislation and execution. When it restructures executive governance so that

21

no chain of accountability exists to allow the supreme executive opportunity to ensure faithful execution, it has intruded into executive power, even if no legislator sits on the board.

The provision of KRS 247.110(1) allowing the board's voting members to elect their own chair and vice chair is not unconstitutional in isolation. It cannot stand here, however, because the voting membership itself is unconstitutionally constituted. A board selected through an unconstitutional appointment structure cannot validly exercise statutory authority to select its leadership. Separation of powers is concerned with structure, not labels, and the substance governs. *City of Louisville v. German,* 150 S.W.2d 931, 935 (Ky. 1940) (examining beyond the formal statutory label and evaluating the actual operation and practical effect of the statutory scheme rather than its nominal designation, confirming that constitutional analysis and validity depends on substance, not labels). The separation of powers does not require equality of power among the branches. It requires that each branch retain the functional capacity to perform its constitutionally assigned role. Additionally, the constitution does not make executive authority contingent upon legislative grace. While the Legislature may define statutory offices, it cannot condition the existence of executive supervision on its own discretion where the constitution assigns responsibility for execution to the executive branch.

**Fidelity to Stare Decisis is Not Optional.** Stare decisis is not a convenience, but a constraint that ensures stability, predictability, and discipline. In *LRC*, this Court refused to interpret *Brown v. Barkley,* 628

22

S.W.2d 616 (Ky. 1982) [hereinafter *Brown*] as a license for legislative dominance. 664 S.W.2d at 922–23 (Ky. 1984). It warned that such a reading would effectively eliminate separation of powers. 664 S.W.2d at 922.

Contrary to the assertion of the dissent, *LRC* made clear that *Brown* recognizes legislative power only—legislative power—not residual authority over executive structure. *Id.* at 923. Separation of powers means the Legislature cannot restructure executive authority simply because it created the office. If it could, Sections 27 and 28 would mean nothing. *Brown* cannot be expanded beyond its holding to justify structural dilution that *LRC* would not tolerate.

*Brown v. Barkley* recognized that the Legislature may prescribe manner of appointment for statutory offices. 628 S.W.2d 616 (Ky. 1982). But the power identified in *Brown* is legislative power—and legislative power only. *Brown* and *LRC* are not in conflict. While *Brown* recognizes that executive power may be distributed among constitutional officers, it does not authorize the Legislature to structure that distribution in a manner that eliminates unified executive accountability. 628 S.W.2d at 622-624. Legislative power does not extend to reengineering the constitutional structure of the executive branch. Read in light of *LRC*, *Brown* does not authorize the Legislature to dismantle executive supervision or diffuse responsibility so completely that no authority remains with the supreme executive to ensure faithful execution. Diffusion of executive tasks is not equivalent to dissolution of executive accountability.

## III. STRUCTURAL VIOLATIONS REQUIRE NO SHOWING OF HARM

The Constitution tolerates limited overlap between branches, particularly in areas such as oversight and appropriations. It does not permit structural arrangements that displace or neutralize a branch's ability to perform its core constitutional function. Whether the Governor has shown a "concrete and substantial detriment" is not the constitutional standard. Separation of powers is violated when the structure is compromised—not when dysfunction is measurable. *LRC* did not wait for operational collapse before enforcing separation. 664 S.W.2d at 931. It enforced the boundary because the Constitution commands it. Structural boundaries are enforced at the point of encroachment—not after injury has occurred. *Id.* 919.

## IV. SEVERABILITY DOES NOT SAVE THE STATUTES

The unconstitutional features of HB 334 and HB 518 are not incidental. They are structural. KRS 446.090 favors severability, but severability is unavailable when the remaining provisions are inseparably connected with the unconstitutional design or incapable of execution consistent with legislative intent. Here, the appointment shift, transition provision, independent structure, and legislative-accountability language operate together; removing only the most obvious constitutional defects would preserve the architecture of displacement while pretending to cure it. The redistribution of appointment and removal authority is not peripheral; it is the design.

Sections 27 and 28 of the Kentucky Constitution impose a strict and categorical separation of powers. Section 69 vests the "supreme executive

24

power" in the Governor. Section 81 commands that the Governor "take care that the laws be faithfully executed." These provisions are structural, not aspirational. They require that executive power remain sufficiently unified to permit accountability. HB 518 and HB 334 do not merely adjust appointment procedures; they restructure executive power in a manner that dissolves accountability and blurs the constitutional boundaries the framers imposed.

The fragmentation of executive supervision and the embedding of legislative proximity are integral to the statutory scheme. Removing isolated provisions would not restore constitutional structure. The defect is architectural, not textual. Accordingly, the unconstitutional provisions are not severable.

The Constitution separates powers. It does not diffuse them beyond recognition. It does not permit one branch to redesign another. And it does not tolerate structures that render constitutional duties unenforceable. That structural reallocation exceeds the Legislature's authority and violates the Constitution.

## CONCLUSION

We do not hold that the Governor must appoint every member of every executive board; we hold only that the Legislature may not structure an executive board in a manner that will not preserve a chain of accountability through which the Governor may fulfill his or her duty to ensure faithful execution. Therefore, we affirm, in part, the result in *Shell*, though on structural grounds embedded in Sections 27, 28, 69, and 81, and hold HB 518

25

unconstitutional and inseverable. We reverse *Coleman*, which upheld a statutory scheme that impermissibly fragments executive authority.

All sitting. Bisig, Goodwine, and Thompson, JJ., concur. Conley, J., concurs in part and dissents in part by separate opinion which Lambert, C.J.; and Nickell, J., join.

CONLEY, J., CONCURRING IN PART AND DISSENTING IN PART: With due respect, I agree with the Court that HB 518 violates the Constitution by creating two *ex officio* members of the State Fair Board (SFB) who are simultaneously members of the General Assembly. This is a violation of the separation of powers. I dissent, however, from the Court in that it concludes the General Assembly's restructuring of the SFB and Executive Branch Ethics Commission (EBEC) violates the Constitution by parceling out appointments to these boards amongst other constitutional officers within the executive branch. Kentucky's Constitution did not create a unitary executive, and the Governor's authority as chief of the executive branch is limited to what the Constitution and the General Assembly deem appropriate. Just as importantly, the Governor's authority is checked and balanced by the presence of multiple other constitutional officers within the executive branch. This is a necessary consequence of a non-unitary executive. There is no violation of the Constitution when the General Assembly disperses executive branch appointments amongst constitutional officers within the executive branch. With the exception mentioned above, I conclude HB 518 and HB 334 are constitutional in all other respects.

26

### I. The legislature may disperse the appointment power across the executive branch.

The primary point of contention the Governor takes with the reorganization of both the SFB and the EBEC is the shifting of appointment power away from his office and the placement of that power with various other constitutional officers within the executive. The Governor asserts this change undermines his authority as the supreme executive by dispersing it to offices over which the Governor has little to no control and rendering him unable to manage boards nominally under his purview by giving him only a minority of appointments. The parties opposing the Governor counter that nowhere in the Constitution is the Governor entitled to a majority of appointments for all bodies within the executive branch and, in fact, the clear thrust of the Constitution is that the General Assembly has wide discretion in determining how appointments to executive boards and commissions are to be made. I begin with a discussion of Kentucky's unusually strong form of plural executive government and then address the constitutional provisions at issue.

Unlike the federal government, Kentucky's Constitution does not place the whole of executive power within a single office to whom all other executive officers are beholden. Rather, Kentucky's plural executive (also commonly called a divided executive or unbundled executive) places the power of the executive into the hands of what we refer to as the Section 91, or constitutional, officers: the Attorney General, the Agriculture Commissioner, the Secretary of State, the Auditor, and the Treasurer. These Section 91 officers are elected by the people and subject to the "supremacy" of the

Governor, but otherwise operate independently. This arrangement is not uncommon among the states. Indeed, it is a curiosity that more than 200 years after the Framers settled upon the form of a unitary executive for our federal system, most of the states have opted for the competing, plural model of executive power. *See* Miriam Seifter, *Understanding State Agency Independence*, 117 MICH. L. REV. 1537, 1552 (2019) ("Almost all states today elect some number of officials other than the governor, and the vast majority establish this arrangement in the constitution itself.").

While the plural executive model is common, how that functions in practice varies from state to state, particularly, as relates here, with regard to the relationship between the governor and the other constitutional officers.

> Supervision disputes between governors and constitutional officers are unique in that both sides can claim constitutional executive power. These cases—governor versus attorney general, or governor versus controller, for example—are those in which the popular wisdom assumes complete agency independence. In reality, these rulings are all over the map.

*Id.* at 1572. While most states "forge a middle ground, reaching 'clause-based' decisions, or simply deferring to the legislature, without overarching conclusions about agency independence or the governor's supervisory power[,]" *Id.* at 1573, some, like Indiana, affirm the Governor's control over the "minor administrative officers" that are the constitutional officers. *Id.* (quoting *Tucker v. State*, 35 N.E.2d 270, 291 (Ind. 1941)). Kentucky stands on the other end of the spectrum, unique in the strength it grants to the independence of the constitutional officers. *Id.* (referring to *Brown v. Barkley*, 628 S.W.2d 616 (Ky.

28

1982), "[t]he Kentucky court seems to stand alone, however, in deriving such a categorical rule of independence.").

We described the relationship between the Governor and the Section 91 officers, and the legislature's power vis-à-vis both in the landmark decision of *Brown v. Barkley*. In that case, the Governor "issued an executive order. . . transferring various functions, personnel and funds from the Department of Agriculture. . . to another executive agency and, among other things, placing it and several other agencies within a newly-created Energy and Agriculture Cabinet." The Commissioner of Agriculture challenged the transfer, setting up a dispute over the extent of the Governor's power over the constitutional officers. We found the Governor lacked the authority to control the constitutional officers, holding,

> That the Const. Sec. 91 officers are to be elected by the people suggests that, whatever their duties, they are not answerable to the supervision of anyone else. This inference finds support in that provision of our Constitution (Sec. 78) which empowers the Governor to require information in writing from the officers of the executive branch upon any subject relating to the duties of their offices. Had the framers of the Constitution intended the Governor to have any further authority over these officers, Sec. 78 would have been unnecessary and, indeed, an anomaly.

*Barkley*, 628 S.W.2d at 623. The Court also discussed how the General Assembly may utilize the Section 91 officers, which we will discuss below.

The gravamen of the *Barkley* opinion, as it relates to the constitutional officers, is that while the constitutional officers are subject to the Governor's nominal supremacy, the actual effect of that supremacy is limited. True, the Constitution grants the Governor certain powers while giving to the

29

constitutional officers only what the legislature sees fit to apportion them, *see Barkley*, 628 S.W.2d at 621 ("It is interesting to observe that in dealing with the General Assembly and with the office of Governor the Constitution speaks in terms of 'powers,' but with regard to the Sec. 91 officers mentions only 'duties' and 'responsibilities.'"), but the important point as it relates to the Fair Board and to the EBEC is that the executive power can flow from the constitutional officers just as readily as from the Governor.

This brings us to the other principle set forth in *Barkley*, that the General Assembly holds a great deal of power in determining how the executive fulfills its role. We determined the Section 91 officers which came into existence "so naked of authority" existed as "convenient receptacles for the diffusion of executive power." *Id.* at 622.

> As the Governor is the "supreme executive power," it is not possible for the General Assembly to create another executive officer or officers who will not be subject to that supremacy, *but it definitely has the prerogative of withholding executive powers from him by assigning them to these constitutional officers who are not amenable to his supervision and control.*

*Id.* (emphasis added). The Governor, otherwise given great power in executing the law, is ultimately an instrument to operationalize the laws duly promulgated by the legislature.

> Whereas the judicial branch must be and is largely independent of intrusion by the legislative branch, the executive branch exists principally to do its bidding. The real power of the executive branch springs directly from the long periods between legislative sessions, during which interims the legislature customarily has left broad discretionary powers to the chief executive. It is ironic, but a historic fact of life, that in the past most chief executives have used this very power, given to them by the legislature, to influence the

30

actions of individual legislators and thus exercise control over the legislative process itself. To put it mildly, it was not meant to be that way. It has been that way, however, for the simple reason that the legislature, either by choice or necessity, has conferred upon the executive branch more authority than was consistent with its own independence. *Practically speaking, except for those conferred upon him specifically by the Constitution, his powers, like those of the executive officers created by Const. Sec. 91, are only what the General Assembly chooses to give him.*

*Id.* at 623. (emphasis added). As we later clarified in *Legislative Research Commission v. Brown*, 664 S.W.2d 907 (Ky. 1984), *Barkley* does not hold the General Assembly possesses all "residual" powers of the government. Rather, "[i]mplicit in *Barkley* is that the General Assembly as the legislative branch, has all powers *which are solely and exclusively legislative in nature*. To argue that any other power is given to the General Assembly simply won't wash. The power referred to in *Barkley* is *legislative power and legislative power only*." *Brown*, 664 S.W.2d at 913.

To summarize this structural background, Kentucky's executive branch divides the executive power among a small number of elected constitutional officials. The degree of independence enjoyed by these constitutional officials is uniquely high, placing them as autonomous officials whose duty to the Governor is somewhat limited. These constitutional officials exist as alternative loci of executive power, with the General Assembly able to shift such power within the branch.

This is unsurprising. In 1942, this Court upheld the General Assembly's decision to authorize "the executive departments to employ regular counsel who shall have charge of their respective legal affairs," as a valid withdrawal of

31

power from the Attorney General's office and dispersing it amongst the several executive agencies. *Johnson v. Commonwealth ex rel. Meredith,* 165 S.W.2d 820, 829 (Ky. 1942). The Court noted "the many instances where the legislature has from time to time assigned to other officers duties which naturally and conventionally belong to the Governor or to a sheriff or constable or other constitutional officer," and that this "power has not been questioned." *Id.* at 828.

And so, we turn to the question at hand: do the Governor's prerogatives as the supreme executive with the duty to faithfully execute the laws place a limit upon the General Assembly's ability to choose by whom appointments to the SFB and the EBEC are made?  The Governor directs us to two sections of the Constitution that he argues imply such a limit, Sections 69 and 81. Section 69 provides, "[t]he supreme executive power of the Commonwealth shall be vested in a Chief Magistrate, who shall be styled the 'Governor of the Commonwealth of Kentucky.'"  Section 81 reads, "[the Governor] shall take care that the laws are faithfully executed."  Read together, the Governor argues, these Sections mandate the Governor having a majority of appointments on an executive board because otherwise he would lack the ability to ensure a board followed the law, possibly losing that power to another constitutional officer.

From the outset, there can be no disagreement that the Constitution provides no clear, explicit directive as to the Governor's role in appointing members of executive boards.  The closest in subject matter is Section 76

which gives the Governor the power "to fill vacancies by granting commissions, which shall expire when such vacancies shall have been filled according to the provisions of this Constitution[,]" but this power exists "except as otherwise provided in this Constitution" and so is limited to filling vacancies of "such officers as are created by the Constitution[,]" not members of a legislatively created board. *Rouse v. Johnson*, 28 S.W.2d 745, 751 (Ky. 1930). Thus, the power the Governor contends he has can only be found by implication. Our law, however, presumes "in framing the constitution great care was exercised in the language used to convey its meaning and as little as possible left to implication." Nevertheless, we recognize "that implied provisions are as essentially a part of the constitution as its express provisions." *City of Louisville v. German*, 286 Ky. 477, 150 S.W.2d 931, 935 (1940).

In contrast to Section 76, there is Section 93, wherein it states, in relevant part,

> Inferior State officers and members of boards and commissions, not specifically provided for in this Constitution, may be appointed or elected, in such manner as may be prescribed by law, which may include a requirement of consent by the Senate, for a term not exceeding four years, and until their successors are appointed or elected and qualified.

Ky. Const. § 93. The clear import of Section 93 is that members of boards and commissions may be appointed as provided by law, which inescapably points to the power of the legislature to determine whom within the executive the appointment power lies. *Cf. Landrum v. Commonwealth ex rel. Beshear*, 599 S.W.3d 781, 786 (Ky. 2019) (discussing Section 93's imperative that "The duties and responsibilities of [the Attorney General] shall be prescribed by law"

33

and noting "since '[t]he legislature makes the laws,' the General Assembly is the body that outlines the power of the Attorney General."). We have previously said,

> when section 93 and 107 conferred the power upon the legislature to provide for the "filling of inferior state officers in such manner as may be prescribed by law," or to "provide for the election or appointment" of created county or district officers, the conclusion is inevitable, from the language employed and in the light of the purpose of the constitutional requirement segregating and separating the functions of government, that *the authority of the legislature is limited to making such provisions by exercising its authority to pass an act containing them and directing upon whom or with whom the power to appoint or elect was lodged*, which electing and appointing agency should, perhaps, be selected from the department to which the duties of the office necessarily appertain.

*Sibert v. Garrett*, 197 Ky. 17, 246 S.W. 455, 460 (1922) (emphasis added).

Taking Sections 76 and 93 together, the language of the Constitution strongly indicates that the Constitution is not meant to give the Governor as powerful a role in appointing members of executive boards as he asserts. Section 76 plainly limits the Governor's power to fill vacancies to unoccupied, constitutionally-created offices and Section 93 fills in any gap for legislatively-created offices by providing that the General Assembly has the power to decide by whom appointments to those offices are filled.

This reading of our Constitution comports not only with its plain language, but also with the apparent intention of the framers of the 1891 Constitution. As we have before recounted with regard to the 1850 Constitution,

> Prior to the adoption of the Constitution of 1850, great power lay with the Governor, for in him was the appointment of a host of

> officials of the state.  One of the moving causes for the calling of that constitutional convention was the hostility of the people to this condition.  By the instrument then adopted, the Governor was shorn of a great deal of the power he had theretofore enjoyed, and much of it has never been restored to him.

*Votteler v. Fields*, 23 S.W.2d 588, 590 (Ky. 1926).  As *Votteler* states, the Framers of the 1891 Constitution did not restore the appointment power previously so strongly lodged with the office of Governor.  Indeed, during the debates, the Delegates remained wary of expansive powers of appointment for the Governor.

During discussion of what is now Section 81, Delegate and then-Governor Simon Bolivar Buckner wished to append to that provision the following language: "And for the accomplishment of this end he shall have power to suspend from office any executive or ministerial officer who may fail and refuse to discharge the duties of this office, and to fill the vacancy thus occasioned."  Vol. I, *Official Report of the Proceedings and Debates in the Convention*, 1458 (1890).  Gov. Buckner's attempt to restore such expansive powers to the Governor's office was not taken well by his fellow delegates.  Delegate C.J. Bronston of Lexington objected to the "infringement upon the Republican Government" that would "place[] in the arbitrary power of the executive almost every subordinate officer in the Commonwealth of Kentucky" and suggested the Governor's power to execute the law was satisfied by calling the attention of the Courts and legislature to officials not performing their duty.  *Id.* at 1459.  Delegate Thomas S. Pettit bemoaned the "almost regal power" the amendment would give to the Governor, but advocated a middle ground

35

between Buckner and Bronston, saying "if the Governor has imposed upon him the duty to see that the laws are faithfully executed, some power should exist somewhere to execute those laws." *Id.* at 1459-60. Delegate Morris Sachs then expounded on the question:

> He [the Governor] cannot be held nor should he be considered responsible for the acts of the people who are selected to fill positions by the same sovereign voice and sovereign power that calls him to fill his position. So far as these other officers of the State are concerned they are his equal; they are all the servants of the people of the Commonwealth of Kentucky, so that I say they decide the idea that he is not conscientiously bound to see that these others do their duty, believing that he is not responsible for those over whom he has no control. I favor this section 14 as it now stands and as it has stood since the adoption of the Constitution of 1849, believing that that is broad enough to accomplish the purposes suggested by the Delegate from Hart, believing that under that the Governor of this Commonwealth can call into force and being all necessary powers of the State as they are vested in the Courts or in the legislature. I say that the power is as broad as it can be: "He shall take care that the laws be faithfully executed." That simply means if the Governor of this State finds that in certain quarters those over whom he has no control, who are elected by the same sovereign power which places him in office, are not doing their duty, then, under this authority, he can direct the attention of the proper tribunal to it, and see that the trouble is remedied as speedily as possible. That is all that can be done under our form of government.

*Id.* at 1460. Other delegates expressed similar feelings of distaste for Buckner's amendment, and it was ultimately withdrawn.

I acknowledge that Governor Buckner's attempt to grant the Governor near plenary appointment power goes far beyond what the current Governor seeks here, but I also consider the umbrage felt by some of the Framers upon Buckner's attempt to restore some of that appointment power lost by the Governor post 1850. It may be so that the 1890 Convention was called to

36

"control legislative excesses[,]" Sheryl G. Snyder & Robert M. Ireland, *The Separation of Governmental Powers under the Constitution of Kentucky: A Legal and Historical Analysis of L.R.C. v. Brown,* 73 KY. L.J. 165, 167 (1984), but there appears to have been little taste to curtail legislative intemperance by handing power back to an only recently weakened executive. I would also be remiss to not observe that in the minds of at least two delegates to the Convention, the way the Governor ensured the laws were faithfully executed was by mere supervision, not by active management.

Accordingly, I conclude Section 81 does not mandate every board and commission in the executive be dominated by the Governor's appointees. I agree with Delegate Pettit that the duty imposed by Section 81 must mean something, however, and in this instance that duty is satisfied by the fact that the Governor retains a strong contingent of appointees on both the SFB and the EBEC, even if he no longer appoints the majority of either.

Section 69 does not suggest otherwise. "Section 69 of our Constitution creates the office of Governor and vests in him the supreme executive powers of the commonwealth. He has only such powers as the Constitution and Statutes, enacted pursuant thereto, vest in him, and those powers must be exercised in the manner and within the limitations therein prescribed." *Royster v. Brock,* 79 S.W.2d 707, 709 (Ky. 1935). The Governor's role as chief magistrate is limited by other provisions of the Constitution, by the fact that the Constitution grants to the legislature the ability to determine how appointments are made to boards and commissions, and by the fact the

37

Constitution has created other executive-branch constitutional officers into whose office executive power can be placed.

One additional point about the 1891 Constitution. Prior to the finalization of the Constitution's language, the revisory committee removed a portion of Section 76 in order to avoid conflict with Section 93. *Kraus v. Ky. State Senate*, 872 S.W.2d 433, 438 (Ky. 1993). The struck portion read, the Governor "shall appoint, with the advice and consent of the Senate, all State officers who are not required by this Constitution, or the laws made thereunder, to be elected by the people." Vol. IV, *Debates*, 5728 (1891). In discussing the need for removing the passage, Delegate Bronston observed that letting it remain would

> disturb that settled principle which, we believe, has been approved by the people, that as to all these subordinates, it should be left to the power of the General Assembly to say whether they should be elected or appointed, and if not elected by the people, by whom they should be appointed.

*Id.* Bronston further explained the deleted passage was wholly new to the 1891 Constitution and had been added "without intending that it should have the far-reaching effect it has." *Id.* at 5729. The debate over this change illustrates the Framers had considered the General Assembly's appointment power and determined that it was the General Assembly that retained the power to determine "by whom" an appointment should be made.

Ultimately, the shifting of executive power within the executive branch does not fatally undermine the Governor's Section 69 or Section 81 prerogatives. The Governor retains representatives on the SFB and the EBEC

38

who will be able to ably advocate for the position of his office. In addition to this active role, the Governor will also possess the supervisory powers discussed during the Convention. Although the Governor will no longer actively manage the SFB and the EBEC, he retains the power under Section 78 to "require information in writing from the officers of the executive Department upon any subject relating to the duties of their respective offices" and, if his office believes a board or commission is acting illegally, can seek recourse in the courts of the Commonwealth, a remedy so often sought for disputes within and between the branches of government.

Just as importantly, and fatally contradicting the Governor's contention that he has sole responsibility for ensuring the laws be faithfully executed by members of the executive branch, we have held the Attorney General has a common-law duty, protected by the Constitution, "to protect public rights and interests by ensuring that our government acts legally and constitutionally." *Commonwealth ex rel. Beshear v. Commonwealth Office of the Governor ex rel. Bevin*, 498 S.W.3d 355, 363 (Ky. 2016). The Attorney General may bring suit against any executive agency or member thereof if he believes that agency or executive official is violating constitutional or statutory law. *Id.* ("If the Attorney General has the power to initiate a suit questioning the constitutionality of a statute, he must also have the power to initiate a suit questioning the constitutionality or legality of an executive action."). If the Governor is not even supreme in the chief duty of his office under Section 81, that "He take care that the laws be faithfully executed," Ky. Const § 81, but in fact shares this power

39

with the Attorney General who is not responsible to him, then it can hardly be contended the Governor's supremacy in the executive is infringed upon when it comes to the appointment power, when Section 93 so clearly allows the General Assembly to prescribe the manner by which the appointment of members of executive boards and commission shall be had. *Sibert*, 246 S.W. at 459-60.

Insofar as HB 518 and HB 334 raise the question of the legislature's ability to alter the Governor's ability to appoint members to executive-branch boards by re-assigning that power to other constitutional officers within the executive branch, I conclude they are constitutional. But this is not all that these laws do. There is also the provision within HB 518 allowing for the *ex officio* membership of the Senate President and Speaker of the House on the SFB.

## II. *Ex officio* appointments of members of the legislature to executive boards violate the separation of powers.

HB 518 provides that, in addition to altering the source of most of the appointments to the Board, two new *ex officio*, non-voting members are to be added: the President of the Senate or his designee and the Speaker of the House or his designee. 2021 Ky. Acts ch. 163, § 2(1)(d) & (e). The governor contends these appointments violate Kentucky's separation of powers pursuant to our decision in *Legislative Research Commission v. Brown*, 664 S.W.2d 907 (Ky. 1984). Commissioner Shell contends the appointments do not run afoul of Sections 27 and 28 or our decision in *Brown* because the legislative appointees

40

are non-voting and thus wield no real power on the Board. I conclude the latter assertion to be incorrect and find the appointment of members of the legislature to an executive board, irrespective of the ability to vote, violates our separation of powers.

> Sections 27 and 28 of our constitutions provide, respectively, that
>
> [t]he powers of the government of the Commonwealth of Kentucky shall be divided into three distinct departments, and each of them be confined to a separate body of magistracy, to wit: Those which are legislative, to one; those which are executive, to another; and those which are judicial, to another[,]

and "[n]o person or collection of persons, being of one of those departments, shall exercise any power properly belonging to either of the others, except in the instances hereinafter expressly directed or permitted." The provisions have traditionally been "strictly construed" with the recognition that "[p]erhaps no state. . . has a Constitution whose language more emphatically separates and perpetuates what might be termed the American tripod form of government than does our Constitution[.]" *Id.* at 912-13 (quoting *Arnett v. Meredith*, 275 Ky. 223, 121 S.W.2d 36, 38 (1938); *Sibert v. Garrett*, 246 S.W. at 457 (1922)).

Of primary importance for this case is the application of the separation of powers doctrine to legislative appointments in *Brown*. In *Brown*, the Legislative Research Commission, historically a "research, fact-finding, secretariat and general support agency for the General Assembly[,]" sought a declaratory judgment as to the validity of a number of statutes that had been challenged by the Governor. 664 S.W.2d at 911. Of particular relevance was a group of statutes that "empower[ed] the Speaker of the House of Representatives and

41

the President Pro Tem of the Senate to appoint one or more members of particular boards." *Id.* at 920. Another group of statutes made the "Speaker of the House of Representatives and the President Pro Tem of the Senate. . . *ex officio* members of certain existing boards and commissions." *Id.*

In addressing these legislative appointments to executive-branch boards, the Court first looked to Section 93, which provides,

> Inferior State officers, not specifically provided for in this Constitution, may be appointed or elected, in such manner as may be prescribed by law, for a term not exceeding four years, and until their successors are appointed or elected and qualified.

Although we acknowledged that Section 93 on its face allowed the General Assembly to provide for appointments to inferior state offices, our review of the jurisprudence on the matter revealed the legislature's discretion on this matter is not unfettered. We relied on our reasoning in *Sibert*, which in turn was based on the controversial decision in *Pratt v. Breckinridge*, 112 Ky. 1, 65 S.W. 136 (1901), to find the appointments unconstitutional. *Pratt* held that it is not the fact that a member of the legislative branch occupies an office that offends the Constitution, but rather that the legislative member has exercised the executive power of appointment whether, to appoint another individual to a position, or, as in this case, to appoint themselves to a position. Understood in this way, the voting power of the legislative member is of no import to the analysis. The question is simply whether the constitution permits the legislature to make the appointment in the first place.

42

*Sibert* reinforces this interpretation. In that case, we referenced Ruling Case Law (the predecessor to American Jurisprudence):

> The appointment of officers is intrinsically an administrative or executive act, but this does not imply that no appointment can be made by any department of government other than the executive, for all the authorities agree that the courts and the legislature may appoint those public officers which are *necessary* to the exercise *of their own functions.*

*Sibert*, 246 S.W. at 458 (quoting 22 RULING CASE LAW *Nature of the Power* § 73 (1929)). We then cited with approval the language of the Missouri Supreme Court, which addressed a similar provision in its constitution, writing,

> That section expressly authorizes the General Assembly, acting within its legislative capacity, to pass a law prescribing the manner in which an appointment shall be made, but it does not authorize the General Assembly to make the appointment itself nor to authorize any one unconnected with the government to do so. To provide by law the manner in which an appointment shall be made is one thing; to make the appointment is another; the one is in its nature legislative; the other is essentially executive.

*Id.* at 459-60 (quoting *State ex inf. Hadley v. Washburn*, 67 S.W. 592, 595 (Mo. 1902)).

The *Brown* decision followed the reasoning shown above. The appointments to various executive boards by members of the legislature were unconstitutional because they "fl[ew] in the face of the principle which declares such appointments cannot be made by the General Assembly itself." *Brown*, 664 S.W.2d at 923. Similarly, the act of creating *ex officio* positions for legislative members on executive boards was an "appointment thereto" and violative of the separation of powers. *Id.* at 924. In either case, the issue was

not that a legislature-selected member of a board was sitting, but rather that the General Assembly had improperly exercised the power of appointment.

Having recounted the mode of analysis applied by this Court to address legislative appointive overreach, I acknowledge that the language of *Brown* and its precursors is overbroad. Under a strict application of the *Pratt-Sibert-Brown* line of reasoning, not only is the General Assembly forbidden from making one of its own an *ex officio* member of an executive board, but it would be prohibited from creating *any* such positions, including for the Governor. How could we describe the act of making the Governor or the Dean of the College of Agriculture *ex officio* members of the Board other than as an appointment made by the legislature? The longstanding practice of creating *ex officio* positions on executive boards, as well as the patent absurdity of holding the Governor may not be appointed *ex officio* to a board within his own branch of government, convinces me that a clarification of *Brown* is necessary within this class of appointments.

As to those *ex officio* positions not filled by members of the General Assembly, but by the Governor and the Secretary of the Finance and Administration Cabinet on the SFB, I conclude those appointments are lawful. I find guidance in *Rouse v. Johnson*, 28 S.W.2d 745 (Ky. 1930). In this case, the Court wrote,

> [t]hat the legislature may annex additional duties to a constitutional office, or confer powers upon a constitutional officer other than those expressly prescribed by the Constitution, unless inhibited from so doing by that instrument, is everywhere recognized and practiced in this and other jurisdictions,

44

illustrations of which in this state are to be found from time to time since the creation of the commonwealth. . . .

*Id.* at 749. Within the framework of our constitution, the legislature has within its power to assign constitutional officers of the executive branch to *ex officio* roles within executive boards without running afoul of Sections 27 and 28.

Regarding the *ex officio* positions on the SFB for the dean of UK's College of Agriculture, the Kentucky Future Farmers of America state president, and the Kentucky 4-H Organization state president, I can similarly discern no mischief in allowing the General Assembly to create *ex officio* positions for those individuals. I look to our decision in *Kentucky Association of Realtors, Inc. v. Musselman*, 817 S.W.2d 213 (Ky. 1991) for guidance.

In that case, the Court stated that, unlike in *Brown* where the statutes provided a more or less direct path to appointment by the General Assembly,

> the statute presently in question . . . gives the General Assembly no voice in the selection of committee members; its reach extends solely to providing a method of selection with reasonable criteria to generate commission members qualified for the position through participation of an organization, the Kentucky Association of Realtors, which is independent of legislative control.

*Id.* at 217.

The same logic undergirds why the General Assembly may properly designate non-governmental actors as *ex officio* appointees to an executive board. In making such an appointment, the General Assembly is not choosing an individual; rather, it selects an office, the holder of which is chosen without input from the General Assembly and who is independent of the legislature's whims, and it is that officeholder who is the appointee. Second, with the *ex*

45

*officio* positions at issue presently, none have a direct relationship to the General Assembly. Finally, the addition of those three individuals to the SFB serves a reasonable and logical purpose of appointing qualified individuals. All three have a close connection to the agricultural enterprise of Kentucky and perform a valuable service to the SFB in executing its mission.

In sum, I would affirm our holding in *Brown* that when the General Assembly appoints members to a board that is not connected to the mission of the legislative branch, those appointments violate Sections 27 and 28 of the Constitution. I would further clarify *Brown* to hold that the legislature may make *ex officio* appointments to executive boards, with the exception that the General Assembly may not appoint one of its own to such a board. Because the SFB is an executive-branch entity with little direct relation to the business of the legislature, the *ex officio* appointments of the President of the Senate and the Speaker of the House to that board are unconstitutional and void.

## III.    Miscellanies and Conclusion

As to the Governor's remaining arguments against the constitutionality of HB 518, I find them without merit. That a board or commission within the executive branch enjoys a significant amount of independence from the Governor in its day-to-day functions does not, *ipso facto*, unconstitutionally undermine the Governor's authority as head of the executive. *See Univ. of Ky. v. Moore*, 599 S.W.3d 798 (Ky. 2019). In all other respects, I find the Governor's concerns too ill-defined to be subject to any meaningful constitutional analysis.

46

As to severability, I conclude the constitutional provisions of HB 518 are not "essential," "inseparably connected," or "dependent upon" the unconstitutional provisions, to wit, the *ex officio* appointments of two members of the General Assembly such that the two cannot be severed. KRS 446.090. Thus, I would strike down the unconstitutional provisions but uphold the rest HB 518 and the entirety of HB 334 as constitutional.

Lambert, C.J.; and Nickell, J., join.

COUNSEL FOR APPELLANT/APPELLEE, ANDY BESHEAR, IN HIS OFFICIAL CAPACITY AS GOVERNOR; AND APPELLANT, DAVID KAREM, IN HIS OFFICIAL CAPACITY AS A MEMBER OF THE EXECUTIVE BRANCH ETHICS COMMISSION:

Mitchel T. Denham
McBrayer PLLC

S. Travis Mayo
Taylor Payne
Office of the Governor

COUNSEL FOR APPELLANT/APPELLEE, JONATHAN SHELL, IN HIS OFFICIAL CAPACITY AS COMMISSIONER OF THE DEPARTMENT OF AGRICULTURE:

Heather Lynn Becker
Marc Edwin Manley
Kentucky Department of Agriculture

COUNSEL FOR APPELLANT/APPELLEE, COMMONWEALTH OF KENTUCKY EX REL. ATTORNEY GENERAL RUSSELL COLEMAN:

Matthew Franklin Kuhn
Solicitor General

COUNSEL FOR APPELLANT, MARK LYNN, IN HIS OFFICIAL CAPACITY AS CHAIRMAN OF THE STATE FAIR BOARD:

Ellen Frances Benzing
Kentucky State Fair Board

COUNSEL FOR APPELLANT/APPELLEE, DAVID W. OSBORNE, IN HIS OFFICIAL CAPACITIES AS A MEMBER OF THE STATE FAIR BOARD AND SPEAKER OF THE KENTUCKY HOUSE OF REPRESENTATIVES:

David Eric Lycan
Office of the Speaker of the House

Gregory Allen Woosley
Legislative Research Commission

COUNSEL FOR APPELLANT, BERTRAM R. STIVERS, II, IN HIS OFFICIAL CAPACITIES AS A MEMBER OF THE STATE FAIR BOARD AND PRESIDENT OF THE KENTUCKY STATE SENATE:

Jean Winfield Bird
Legislative Research Commission

David Earl Fleenor
R. Vaughn Murphy
Office of the Senate President

COUNSEL FOR APPELLANT/APPELLEE, SECRETARY LINDY CASEBIER, IN HIS OFFICIAL CAPACITIES AS SECRETARY OF THE KENTUCKY TOURISM, ARTS, AND HERITAGE CABINET, AND AS A MEMBER OF THE STATE FAIR BOARD:

Mitchel T. Denham
McBrayer PLLC

Sarah Gaines Grider Cronan
Donna Allen Schneiter
Kentucky Tourism, Arts and Heritage Cabinet

COUNSEL FOR APPELLEE, MICHAEL G. ADAMS, IN HIS OFFICIAL CAPACITY KENTUCKY AS SECRETARY OF STATE:

Jennifer Schwartz Scutchfield
Michael Rollin Wilson
Office of Secretary of State

COUNSEL FOR APPELLEE, ALLISON BALL, IN HER OFFICIAL CAPACITY AS STATE AUDITOR OF PUBLIC ACCOUNTS:

Alexander Y. Magera
Auditor of Public Accounts

Savannah Grace Baker
Jeremy Joseph Sylvester
Office of Kentucky Auditor of Public Accounts

COUNSEL FOR APPELLEE, EXECUTIVE BRANCH ETHICS COMMISSION:

Susan Stokely Clary

COUNSEL FOR APPELLEE, LEGISLATIVE RESEARCH COMMISSION:

Gregory Allen Woosley
Legislative Research Commission


COUNSEL FOR APPELLEE, MARK H. METCALF, IN HIS OFFICIAL CAPACITY
AS KENTUCKY STATE TREASURER:

Robert Lucian Gullette, Jr.
Sam Preston Burchett
Office of the Kentucky State Treasurer

COUNSEL FOR AMICUS, DENNIS FLEMING, JR., AUTHOR OF THOMAS
JEFFERSON AND THE KENTUCKY CONSTITUTION:

Sheryl Glenn Snyder
Frost Brown Todd LLP